Timothy M. Bechtold
**BECHTOLD LAW FIRM, PLLC**
PO Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net

Elizabeth M. Forster
**FORSTER LAW, PLLC**
P.O. Box 30342
Billings, MT 59107
(203) 856-5791
liz@forster-law.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES; NATIVE ECOSYSTEMS COUNCIL; and COUNCIL ON WILDLIFE AND FISH, | Case No. <u>CV-25-104-BU-TJC</u> |
| Plaintiffs, | |
| vs. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| AMANDA JAMES, Dillon Field Manager of the Bureau of Land Management; SONYA GERMANN, Montana/Dakotas State Director of the Bureau of Land Management; BILL GROFFY, Acting Director of the Bureau of Land Management; and UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| Defendants. | |

1

Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council, and Council on Wildlife and Fish allege as follows:

## INTRODUCTION

1.    This is a civil action for judicial review under the citizen suit provision of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, of the U.S. Bureau of Land Management's ("BLM") authorizations, analyses, and lack thereof related to and regarding the re-authorization of widespread grazing and the implementation of various "livestock management and range improvement projects" in the Grasshopper Watershed, west of Dillon, Montana ("the Grasshopper Watershed Project," or "the Project").

2.    The Grasshopper Watershed contains some of the highest value habitat for sage grouse in Montana, as well as for a variety of big game species, designated sensitive species, and other wildlife.

3.    Yet, the Project and the underlying analysis turn a blind eye to the impacts of grazing and grazing infrastructure on sage grouse, sage grouse habitat, and other wildlife in the Grasshopper Watershed to maintain the status quo of grazing management.

4.    Plaintiffs attest that the decisions approving the challenged authorizations, analyses, and lack thereof are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law.

2

5.     Defendants' actions or omissions violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–70, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–87, and the APA.

6.     Plaintiffs request that the Court set aside the Project decision pursuant to 5 U.S.C. § 706(2)(A) and 16 U.S.C. § 1540(g) and enjoin implementation of the Project.

7.     Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and other such relief as this Court deems just and proper.

## <u>JURISDICTION</u>

8.     This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), and 2202 (declaratory judgment and further relief).

9.     Venue in this case is proper under 28 U.S.C. § 1391(e) and Local Rule 3.2 because Defendant James resides within the Butte Division of the United States District Court for the District of Montana.

**PARTIES**

10.    Plaintiff Alliance for the Wild Rockies is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion; its native plant, fish, and animal life; and its naturally functioning ecosystems. The Alliance's registered office is located in Missoula, Montana. The Alliance has more than 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality—including in the Grasshopper Watershed—and expect to continue to do so in the future. The Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve the Grasshopper Watershed ecosystem as set forth below. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

11.    Plaintiff Native Ecosystems Council ("NEC") is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. NEC is dedicated to the conservation of natural resources on public lands in the Northern Rockies. In furtherance of this mission, NEC's members and supporters remain active in wildlife management, including sage grouse conservation. Its members use and will continue to use the Grasshopper Watershed for work and for outdoor

recreation of all kinds, including fishing, hunting, hiking, and horseback riding. The BLM's unlawful actions will adversely affect NEC's organizational interests, as well as its members' use and enjoyment of the Grasshopper Watershed. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

12.    Plaintiff Council on Wildlife and Fish (the "Council") is a public interest organization (tax-exempt, non-profit) formed to ensure the maintenance of biological diversity and the ecological integrity of all natural ecosystems through the enforcement and administration of laws such as FLPMA, NEPA, and all other laws that require the recognition, discussion and conservation of such ecosystems and protect the organic or inorganic components that comprise such natural ecosystems. The Council's registered office is in Bozeman, Montana. The Council's members are in Montana. They enjoy and appreciate indigenous wildlife, fish, spiritual connection and renewal, clean water, and high-quality aquatic and terrestrial habitat. Council members expect to continue these practices well into the future, including in the Grasshopper Watershed. The Council's members' professional, spiritual and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. The Council brings this action on its own behalf, on behalf of its adversely affected members and on behalf of numerous, voiceless life forms eminently threatened with displacement,

injury, and/or death.

13.    An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Grasshopper Watershed area for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future. Plaintiffs' members and staff are concerned with protecting the wildlife, ecological integrity, and other natural values of the Grasshopper Watershed.

14.    The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NEPA, FLPMA, and the APA. The requested relief would redress these injuries, and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

15.    Defendant Amanda James is the Field Manager and BLM official responsible for preparing the December 11, 2024, decisions rejecting many of Plaintiffs' objections to the Project. Ms. James is sued in her official capacity as the manager of the Dillon Field Office of the BLM, located in Dillon, Montana. 43 C.F.R. § 1601.0–4(c).

16.    Defendant Sonya Germann is sued in her official capacity as the State Director for the Montana-Dakotas BLM, located in Billings, Montana. As State Director, Ms. Germann is the federal official responsible for supervising all Montana-Dakotas BLM officials and ultimately approving the decisions challenged in this case. *Id*. § 1601.0–4(b).

17.    Defendant Bill Groffy is sued in his official capacity as the Acting Director of the BLM. As Acting Director, Mr. Groffy is the federal official responsible for all BLM officials' actions and/or inactions challenged in this case. *Id*. § 16.01.0–4(a).

18.    Defendant Bureau of Land Management is an agency of the United States government within the U.S. Department of Interior, and is responsible for the health, diversity, and productivity of public lands, and for applying and implementing the federal laws and regulations challenged in this case.

19.    Plaintiffs have exhausted all available administrative remedies. Plaintiffs timely submitted written comments and objections concerning the Project in the available administrative review process, and appealed Defendants' decision to the Interior Board of Land Appeals.

## **LEGAL FRAMEWORK**

### **The National Environmental Policy Act**

20.    Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will

7

prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

21.    NEPA generally requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. *Id*. § 4332(2)(C).

22.    "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (2015).[1]

23.    To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Where an agency is uncertain whether it must prepare an EIS, it may prepare an environmental assessment ("EA") to determine whether the action may have significant impacts and thus require preparation of an EIS. *Id*. § 4336(2).

24.    In an EA, NEPA requires the agencies to discuss the need for the proposal, a reasonable range of alternatives to the proposed agency action, the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted. 40 C.F.R. § 1508.9(b) (2020).

25.    To identify the environmental impacts of a proposed agency action, NEPA requires the agency to establish an appropriate baseline, or the existing

---

[1] This regulation, as well as the Council on Environmental Quality's other NEPA regulations at 40 C.F.R. pts. 1500–1508, were rescinded on February 25, 2025. 90 Fed. Reg. 10610 (Feb. 25, 2025). However, since the Decision was issued before the regulations' rescission, they apply here.

environmental conditions, against which the agency "compares predictions of the effects of the proposed action and reasonable alternatives." *Am. Rivers v. FERC*, 201 F.3d 1186, 1195 n.15 (9th Cir. 1999) (citation omitted).

26.    A court reviews an agency action for whether the agency "took a 'hard look' at the environmental impacts of a proposed action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

**The Federal Land Policy and Management Act**

27.    FLPMA and its related regulations govern the BLM's management of lands that fall under its jurisdiction. FLPMA directs the BLM to "develop, maintain, and when appropriate, revise land use plans," 43 U.S.C. § 1712, called "resource management plans" (RMPs), that "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses" on public lands, 43 C.F.R. §§ 1601.0–2.

28.    Generally, an RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004).

29.    All site-specific decisions must conform with the relevant RMP. 43 C.F.R. § 1610.5–3(a). If a proposed action is not consistent with the RMP, the RMP must be amended according to NEPA. *Id.* §§ 1610.5–3(c), 1610.5–5.

30.    The term "plan conformance," as defined in the BLM planning regulations,

means either that resource management actions must be "specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan." *Id*. § 1601.0–5.

**The Administrative Procedure Act**

31.    Because NEPA and FLPMA do not include a citizen suit provision, this case is brought pursuant to the APA. 5 U.S.C. §§ 551–59, 701–06.

32.    The APA allows persons and organizations to challenge final agency actions in the federal courts. *Id*. §§ 702, 704.

33.    The APA declares that a court should hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id*. § 706(2)(A).

34.    An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL ALLEGATIONS

**Greater Sage Grouse**

35.    Greater sage grouse ("GRSG" or "sage grouse") is the largest species of

grouse in North America. They are "sagebrush obligates," meaning they are entirely dependent on sagebrush ecosystems, including for food, shelter, breeding, nesting, and brooding. The species typically occupy large, interconnected expanses of sagebrush habitat, using different features of landscapes depending on its seasonal habitat needs.

36.    Greater sage grouse also are considered an umbrella species for other sagebrush obligates and associated species because when habitat objectives are met for sage grouse, they likely are met for the other species.

37.    Greater sage grouse occupied more than 460,000 square miles across 13 Western states, including Montana, and three Canadian provinces before 1800. However, since European settlement, sagebrush ecosystems have been destroyed, fragmented, and degraded, leaving few pristine and intact sagebrush ecosystems for sage grouse. Greater sage grouse occupy less than half of their historically occupied range.

38.    The loss of the habitat upon which the GRSG rely has caused the continuous decline in their population across their historic range as well as locally. Just between 2021 and 2024, the GRSG population in Montana plummeted about 30%, from 70,346 to 48,783, according to Montana Fish, Wildlife, and Parks ("MT FWP"). Between 2002 and 2024, the population has almost halved, from 88,707 to 48,783.

39.    MT FWP also reported that the number of active leks in Montana has

consistently declined since 2018, from 1,004 in 2017 to 2024. A lek is a communal breeding ground for sage grouse where males engage in elaborate courtship of females.

40.    Though MT FWP reported that the number of active leks has nearly doubled since 2002—from 548 to 970—the annual rate of extirpation of confirmed leks since 2002 is more than double the annual rate of addition of confirmed active leks (6.91% per year versus 2.65% per year).

41.    Livestock grazing and grazing-related infrastructure are some of the most significant threats to the GRSG and sagebrush habitats. Cattle consume native plants upon which sage grouse rely, trample and destroy soils, and increase the spread of weeds that replace sagebrush. Cattle also disrupt sage grouse shelter, breeding, nesting, and other phases of the species' annual life cycles and migration patterns. These effects are particularly pronounced around water infrastructure developments for livestock, including spring developments, as they are vectors for livestock to congregate. Additionally, fences erected to manage livestock can kill sage grouse if they fly into one, fragment sagebrush habitat, and block sage grouse seasonal movement. They also can provide perches for predators.

42.    Efforts to protect the GRSG under the Endangered Species Act ("ESA") have been underway for decades. The movement gained momentum in 1999 when the U.S. Fish & Wildlife Service ("FWS") began receiving citizen petitions to list the

GRSG under the ESA.

43.    Those petitions and resulting litigation eventually led to FWS's 2010 finding that listing of the GRSG under the ESA was "warranted, but precluded." 75 Fed. Reg. 13,910 (Mar. 23, 2010). FWS reasoned that, though the best available science indicated that the species should be listed, immediate listing of the species was precluded by "higher-priority" listing proposals. *Id*.

44.    In response to FWS's "warranted" determination, the BLM in 2015 adopted a coordinated conservation strategy for sage grouse across the Great Basin Region and one specifically covering southwest Montana, called the Idaho and Southwestern Montana Greater Sage Grouse Approved Resource Management Plan Amendment ("ARMPA"). The ARMPA amended the 2006 Dillon RMP, administered by the BLM's Dillon Field Office ("DFO") in southwest Montana, and 23 RMPs in Idaho to "incorporate appropriate measures … to conserve, enhance and restore GRSG habitat in the context of the BLM's multiple use and sustained yield mission under FLPMA." The ARMPA explained that changes in management of greater sage grouse habitats "are necessary to avoid the continued decline of populations across the species' range."

45.    The ARMPA required all resource authorizations, re-authorizations, and actions in GRSG habitat to conform to the ARMPA. In the event any inconsistencies or discrepancies arise between the ARMPA and a previously-approved RMP, the

ARMPA takes precedence.

46.    The ARMPA mapped and classified the important GRSG habitat in the Southwestern Montana subregion either as a Priority Habitat Management Area ("PHMA") or General Habitat Management Area ("GHMA"). PHMAs are considered to have the highest value lands for maintaining sustainable greater sage grouse populations and include areas used for breeding and late brood-rearing, winter concentration areas, and migration or connectivity corridors. GHMAs are lesser priority areas, where some special management will apply to sustain greater sage grouse populations. GHMAs generally include areas of occupied seasonal or year-round habitat outside PHMAs.

47.    The ARMPA also identified and classified the specific threats to sage grouse in specific areas within the Idaho/Southwest Montana subregion. In Southwest Montana, improper grazing and weeds/annual grasses were identified as present and widespread threats. Sagebrush elimination, fire, conifer encroachment, energy, mining, infrastructure, recreation, and urbanization were identified as present but localized threats. The ARMPA also identified fragmentation of GRSG habitat due to climate change-caused stressors as a major threat to the species and their habitat in southwest Montana.

48.    The DFO manages 682,600 acres of GRSG habitat, 460,600 of which is designated as PHMA and the remaining 222,000 of which is designated as GHMA.

In other words, the vast majority of the land that the BLM manages in southwest Montana is considered of the highest value habitat for sage grouse. And the greatest threat to that high-value habitat is grazing and weeds/annual grasses.

49.    The ARMPA directs how the BLM must address these threats in the form of goals, objectives, and management decisions. The goals, objectives, and management decisions are divided into the following categories: Special Status Species, Vegetation, Fires and Fuels Management, Livestock Grazing, Wild Horses and Burros, Mineral Resources, Renewable Energy, Lands and Realty, Recreation and Visitor Services, Travel and Transportation, Mitigation, and Coordination.

50.    Special Status Species Goal 1 ("SSS-G-1") directs that all BLM-authorized activities must "[m]aintain or increase the abundance, distribution, and connectivity of GRSG by conserving, enhancing, and restoring GRSG habitat to maintain resilient populations by reducing, eliminating or minimizing threats to greater sage grouse habitats."

51.    To achieve this, BLM is required, for example, by Special Status Species Management Decision 7 ("SSS-MD-7") to include in all project-level NEPA analyses an evaluation of the project proposals and their effects on GRSG habitat based on the habitat and values affected.

52.    SSS-MD-5 further directs BLM to "[p]rioritize activities and mitigation to conserve, enhance, and restore GRSG habitats[.]"

53.     The ARMPA also contains a variety of management directives specific to ensuring grazing infrastructure does not interfere with the ARMPA's directive to ensure resilient GRSG populations and habitats.

54.     Importantly, Livestock Grazing Management Decision 16 ("LG-MD-16") requires NEPA analysis for renewals and modifications of livestock grazing permits/leases within PHMAs to include specific management thresholds based on the Habitat Objectives, Land Health Standards, and ecological site potential, plus one or more defined responses that will allow the authorizing officer to adjust livestock grazing already subject to NEPA analysis.

55.     The ARMPA stresses the importance of monitoring and data collection to monitor sage grouse habitats and evaluate the effectiveness of a field office's implementation of the ARMPA to conserve GRSG and its habitat. BLM must use the habitat, population, and implementation effectiveness monitoring data it and its partners collect in project analysis, as well as in determining when certain regulatory triggers are met.

56.     The ARMPA calls these triggers "soft" and "hard" triggers. Soft triggers are indicators that management or specific activities may not be achieving the intended results of a conservation action, as demonstrated by population and habitat trends. Meeting a soft trigger requires BLM to enact immediate monitoring and surveillance to determine the cause and may require BLM to curtail certain management

activities.

57.    Hard triggers are indicators that management decisions are not achieving desired conservation results, meaning sage grouse are either not responding to conservation measures or are being negatively impacted by certain management decisions. Hard triggers are measured against the number of active leks, acres of available habitat, and population trends. The meeting of a hard trigger necessitates immediate action to stop a severe deviation from conservation objectives. SSS-MD-21 to -26, SSS-MD-41, and Appendix E govern hard and soft trigger criteria and responses.

58.    The ARMPA outlines specific directives to BLM for how to alter management of specific resources when the goals of sage grouse and GRSG habitat objectives are not being met. LG-MD-6, for example, directs BLM to implement changes in grazing management when livestock management practices are found to not be compatible with meeting or making progress towards habitat objectives. LG-MD-6's recommended modifications include changes in season or timing or use, numbers of livestock, distribution of livestock use, duration and/or level of use, kind of livestock, and grazing schedules.

**The Grasshopper Watershed**

59.    The Grasshopper Watershed encompasses 367,665 acres within Beaverhead County generally west of Dillon. The Watershed drains portions of the Pioneer

Mountain Range. The Watershed's boundaries are delineated by grazing allotments, rather than the true hydrologic boundaries.

60.    The DFO manages about 118,978 acres, or 32.4%, of the Grasshopper Watershed. The BLM-administered lands generally occur from the valley floor along the foothills of the Pioneer Mountains adjacent to U.S. Forest Service-managed lands.

61.    Within the Grasshopper Watershed, 109,276 acres are designated as PHMAs, and 6,397 acres are designated as GHMAs. In other words, almost all the Grasshopper Watershed is of the highest value habitat for greater sage grouse, and the entire Watershed is considered to be priority habitat.

62.    About 90% of the BLM-administered lands in the Grasshopper Watershed is comprised of sagebrush and shrubland, providing both year-round and vital winter habitat for the greater sage grouse, pronghorn, mule deer, moose, elk, pygmy rabbits, and a variety of other species.

63.    The Grasshopper Watershed is known as a stronghold for the pygmy rabbit population in southwestern Montana. Like the greater sage grouse, the pygmy rabbit is managed by the BLM as a "sensitive" species.

64.    Less than 1% of the BLM-administered lands in the Grasshopper Watershed is classified as riparian habitat. However, such habitat provides refugia for nearly all wildlife species present in the Watershed, including migratory birds and beavers.

65.    Forests and woodland habitats comprise about 7% of the BLM-administered lands and also provide essential habitat for black bear, bobcat, mountain lions, dusky grouse, northern goshawk, deer, elk, moose, and a variety of forest-dwelling birds.

66.    The Watershed has been used for livestock ranching of sheep, cattle, and horses since the mid-19th century. After the federal government made public lands widely available for grazing, the Watershed quickly overgrazed by the mid-1880s.

67.    The BLM currently manages 36 grazing allotments that comprise about 117,263 acres of BLM-administered land in the Grasshopper Watershed. The remaining 1,715 acres are unavailable or unleased for livestock grazing.

68.    The Watershed also contains several areas with historic and modern mining operations and was the site of extensive historic and modern timber harvest.

69.    Climate change has further degraded and imperiled the Watershed and sage grouse habitat. Persistent drought, in particular, has resulted in lower stream flows, streams permanently drying up, increased stream temperatures, and little vegetative growth season-to season.

**The Grasshopper Watershed Project**

*Procedural History*

70.    In May 2021, the BLM announced that it was initiating an assessment of the health of the BLM-administered lands in the Grasshopper Watershed and invited public input and participation.

19

71.    On January 5, 2022, the BLM released the Grasshopper Watershed Assessment Report ("GWAR"). The GWAR assessed the Watershed's health using BLM's five Standards for Rangeland Health—upland health, riparian health, water quality, air quality, and biodiversity—and made management recommendations for future site-specific projects.

72.    The GWAR stated that, "an Environmental Assessment (EA) will be completed to address resource issues or concerns identified within the 36 allotments in the GW" based off the GWAR's management recommendations.

73.    The GWAR was released for public review and comment on January 5, 2022. Plaintiffs submitted public comment later that month.

74.    Using the GWAR and comments received through public scoping, the BLM identified resource issues and developed alternatives for what become the Draft EA for the Project.

75.    The BLM posted the Draft EA for the Project to its ePlanning website on March 11, 2024, and allowed for public comment until April 15, 2024.

76.    BLM also posted a document summarizing the findings in the GWAR, entitled the Grasshopper Watershed Summary and Determination of Standards ("Summary"). This was the first document issued related to GWAR since BLM took public comments on the GWAR. It was not subject to public comment.

77.    The Summary explained that the GWAR found that five of the 36 allotments

and the unallotted parcel failed at least one of the five Standards for Rangeland Health: Buffalo Creek Allotment #30617 (riparian health, water quality); Farlin Creek Allotment #20191 (riparian health, water quality); Frenchie Allotment #10121 (riparian health); Reservoir Creek Allotment #30030 (riparian health, water quality); Baldy Mountain Allotment #30037 (biodiversity); Unallotted Eli Spring (riparian health, water quality). The GWAR concluded that livestock grazing was a "significant causal factor" in the failure of the Buffalo Creek, Farlin Creek, and Reservoir Creek Allotments and Eli Springs to meet the riparian health and water quality standards. Forest health conditions were a significant causal factor for the failure of the Baldy Mountain Allotment to meet the biodiversity standard. The GWAR also noted that fences in some allotments were barriers to wildlife and that the BLM would remove, modify, and/or replace such fences. Though the GWAR determined that all 36 allotments met the upland health standard, BLM noted noxious weed infestations in several allotments that would need treatment.

78.     On April 12 and 14, 2024, Plaintiffs submitted extensive comments and supporting documents to the BLM regarding the Draft EA.

79.     On September 5, 2024, Defendant James signed a Finding of No Significant Impact ("FONSI") for the Grasshopper Watershed EA. The FONSI stated that BLM found that the Project will not significantly impact the quality of the human environment, and therefore, an EIS is not warranted. The FONSI was posted on

BLM's ePlanning site on September 9, 2024.

80. Defendant James also signed a Notice of the Proposed Grazing Decision for the Grasshopper Watershed on September 5, 2024. Plaintiffs filed protests to the proposed decision dated September 20 and 24, 2024.

81. December 11, 2024, Defendant James signed the Decision Record for the EA ("the Decision") and the Notice of the Final Grazing Decision for the Grasshopper Watershed ("Grazing Decision").

82. The EA evaluated three alternatives: a no action alternative, which would re-authorize all the grazing permits with no changes or additional projects (Alternative A); the proposed action alternative with livestock management changes or projects on nine allotments and one unallotted area, conifer treatments in riparian areas, conifer treatments in forest and woodland areas, and certain noxious and invasive species management actions (Alternative B); and the proposed action sub-alternative with only grazing permit changes (Alternative C). The BLM largely relied on the GWAR for the Watershed's baseline conditions and its assessment of the effects of the Alternatives, as well as the grazing management changes and rangeland projects authorized by Alternatives B and C.

83. The EA selected and the Decision authorized Alternative B for the livestock management changes for the three allotments where the GWAR determined that livestock management was the cause of the allotments failing the Standards for

Rangeland Health, for nine allotments where the GWAR determined that the Standards for Rangeland Health were met but either the BLM decided proactive measures were appropriate or the operators requested changes to the permitted use, and for the unallotted area. The EA selected Alternative A, the no action alternative, on the 24 other allotments that met the Standards for Rangeland Health.

84.    The Grazing Decision affirmed these selections. As such, BLM renewed the permits on the 24 allotments without changes to the permits' existing terms and conditions under Alternative A.

85.    BLM renewed permits on the 12 allotments operating under Alternative B with some changes to existing permit terms and conditions. Those changes, as well as those for the unallotted area, are as follows:

a. Baldy Mountain Allotment #30037: Adjustment of the existing exclosure fence around the upper ponds on the West Fork of Dyce Creek; construction of a riparian exclosure up to 0.1 miles around the spring source on Dry Gulch. No changes to grazing administration/management.

b. Barretts Allotment #30014: Installation of an underground, 1500-gallon water storage tank for cattle use during the late fall when existing surface waters are prone to freeze. No changes to grazing administration/management.

c. Buffalo Creek Allotment #30617: Installation of spray-painted steel posts to delineate the BLM-private property boundary to prevent the continued winter feeding of cattle on BLM lands. If resource issues do not improve, a permanent fence would be constructed on the boundary. No changes to grazing administration/management.

d. Farlin Creek Allotment #20191: Reduction of days authorized for grazing on BLM lands on the north end of the allotment from 21 to 14 days; installation of a 1-mile fence, 0.6 miles of which is built on BLM lands; development of Woods Rose Spring with a riparian exclosure fence around the spring source and a 1,000-gallon stock tank outside the exclosure. No other changes to grazing administration/management.

e. Frenchie Allotment #10121: Construction of a riparian exclosure around reach #1551. No changes to grazing administration/management.

f. Red Spring #10120: Change of grazing period from 11/16–12/15 to 8/1–11/30 to "provide more flexibility to the permittee." No other changes to grazing administration/management.

g. Reservoir Creek Allotment #30030: Construction of a 0.5 mile 4-wire fence around South Fork Watson Creek; construction of 0.5 miles of 4-

wire fence in Reach #64, with the potential development of a water source if an exclosure is constructed and development is feasible; installation of barriers to prevent unauthorized motor vehicle crossing at Watson Creek reach #1580. No changes to grazing administration/management.

h. Rocky Hills Allotment #10148: Change of grazing schedule from 5/1–6/20 to 4/17–6/6. No other changes to grazing administration/management.

i. Stonehouse Allotment #30005: Construction of 0.8 mi of new fence to create an approximately 80-acre gathering pasture; construction of a 0.1-mile riparian exclosure fence around Truck Bed Spring, the development of the spring, and the installation of a 1,000-gallon water trough. No changes to grazing administration/management.

j. Taylor Creek Allotment #10745: Installation of a short span of jack and rail fence on the north side of Taylor Creek to prevent cattle trailing on the creek bank. No changes to grazing administration/management.

k. Timber Butte Isolated #30632: Change of grazing schedule from 10/01–2/02 to 7/15–11/30. No other changes to grazing administration/management.

l. Eli Spring Unallotted: Removal of about 2 miles of fence and

absorption of upland acreage into Rocky Hills Allotment; reconstruction/modification of remaining 2 miles of fence "to meet wildlife friendly fencing specifications"; installation of 0.75 mile of fence around the Eli Spring area.

86. The Decision and EA authorized Alternative B for riparian, forestland, and weed treatments:

   a. The cutting and potentially utilization of small-diameter Douglas-fir trees that "have established and are out-competing sagebrush" in sagebrush and grassland habitat, and the thinning of Douglas-fir stands in forested habitat across 416 acres on Badger Pass;

   b. The handcutting of conifers within and adjacent to aspen stands in 75 acres across two allotments.

   c. Riparian treatments—specifically conifer removal—in 1.8 miles of Taylor Creek.

   d. Treatment of Canada thistle, weeds, and cheatgrass; mapping of all known and newly discovered cheatgrass and noxious weeds infestations; and pre- and post-treatment weed inventory/control in all conifer treatment units.

87. Plaintiffs filed their notice of appeal of the Decision Record and the Grazing Decision with the Interior Board of Land Appeals ("IBLA") on January 6, 2025.

*Project Baseline*

88.    The GWAR, upon which the EA relies for the Project baseline, fails to disclose and analyze key information and data in assessing whether the Grasshopper Watershed's grazing allotments meet the Land Health Standards and the goals of the ARMPA.

89.    SSS-MD-12 requires BLM to monitor sage grouse and sage grouse habitat health to determine whether the soft and hard triggers have been met. This requires BLM to analyze population and habitat data, including but not limited to the number of active leks, population trends based on annual lek counts, and acres of available sage grouse habitat.

90.    Monitoring data is crucial to alert BLM to when it needs to determine the cause(s) of a trigger being met, and whether BLM needs to adjust its management activities, per SSS-MD-21 to -26 and -41 and the ARMPA's goal of conserving GRSG and GRSG habitat.

91.    However, the GWAR does not disclose or analyze any sage grouse population trend data, including the annual population data taken by MT FWP.

92.    The GWAR also omits any data BLM collected to monitor the hard and soft triggers in Grasshopper Watershed.

93.    The GWAR further does not analyze or otherwise discuss the population and habitat data relative to the hard or soft triggers in the Grasshopper Watershed.

94.    The ARMPA's Habitat Objectives provide specific desired habitat conditions for greater sage-grouse for BLM to monitor for. The Habitat Objectives, outlined in Table 2-2 of the ARMPA, generally are:

    a. To ensure lek security, certain trees—specifically juniper and conifers— should be "absent or uncommon" in shrub and grassland areas within 1.86 miles of occupied leks. Protective sagebrush cover also should exist within 328 feet of an occupied lek.

    b. To provide sage grouse sufficient cover and food, the ARMPA specifies the habitat extent, vegetative cover, vegetative height, and vegetative availability for GRSG's nesting/early brood-rearing season (May 1 to June 30), late brood-rearing/summer season (July to October), and winter (November to March).

95.    However, despite the Habitat Objectives' distinct requirements for vegetation for each of the three defined seasons, the GWAR relies on vegetation data taken in June and July. Without data taken before and during the nesting/early brood-rearing season, BLM cannot justifiably assert that the Watershed meets the Habitat Objectives.

96.    Without this data, BLM cannot actually analyze, for example, how spring grazing is affecting sage grouse nesting and early brood-rearing habitat.

97.    The GWAR also does not disclose any delineations of the leks within and

adjacent to the Grasshopper Watershed, despite the Habitat Objectives' lek-distance requirements for sagebrush cover and tree species.

98.    LG-MD-12 requires BLM, when conducting the land health assessment and grazing permit renewal processes, to evaluate existing livestock management range improvements and their effect on GRSG habitat. It also directs BLM to remove projects not needed for effective livestock management, no longer in working condition, and/or negatively affecting GRSG habitat.

99.    LG-MD-13 directs BLM to prioritize removal, modification, or marking of fences or other structures in areas of high collision risk to reduce GRSG mortality rates from fence strikes.

100.    The GWAR acknowledges the need to modify or reconstruct woven wire fences, dilapidated fences, and fences that do not meet BLM's wildlife-friendly specifications, and the need to remove unnecessary fences in the Watershed.

101.    However, the GWAR does not provide any delineations or data showing the existing fenceline mileage and location, fence types, fence conditions, installed diverters, and recorded strikes by sage grouse and other wildlife. It does not discuss whether existing fencing has affected sage grouse population trends or habitat fragmentation, and whether flight diverters should be installed on existing fences.

102.    The GWAR also lacks any analysis of the impacts of fencing on other wildlife, including antelope, pronghorn, and other game and non-game species.

103.  The GWAR also does not disclose the condition or flow of the existing developed springs and their infrastructure. The GWAR only lists the spring name, allotment, and project ID number.

104.  Further, the GWAR does not analyze the impact of the existing water developments, including the springs, on sage grouse. This is particularly problematic because the GWAR acknowledges that many of the water developments in the Watershed have not been adequately maintained.

105.  The ARMPA recognizes climate change as a "major threat" to GRSG and their habitat.

106.  However, the GWAR does not engage in any meaningful analysis of the impacts of climate change so far on GRSG and their habitat, as well as other wildlife and the greater Watershed ecosystem.

107.  For instance, the GWAR notes that the Watershed experienced "exceptional" drought in 2021, causing low and sometimes dry streams and little vegetative growth. Yet, the GWAR does not discuss how climate change influenced such drought conditions. This kind of analysis is necessary for an adequate baseline.

108.  Since the EA relies on the inadequate GWAR for the Project's baseline, the EA's analysis of the project effects must be inadequate.

109.  Without a proper baseline, BLM cannot determine the Project's actual impact on the environment, and the public cannot scrutinize BLM's compliance with the

law.

*Wildlife*

110.   Of particular note, since the GWAR does not disclose sage grouse population, the BLM has not used the most relevant data to assess how the Project will impact sage grouse population size and lek success, or at least has not disclosed how it has done so.

111.   Like the GWAR, the EA does not contain any population trend data for sage grouse, including the population studies issued by MT FWP for the three years after the GWAR (2022, 2023, and 2024).

112.   The EA also fails to disclose key information about the Project and analyze the effects of certain components of the Project on sage grouse, sage grouse habitat, and other wildlife.

113.   SSS-MD-7 requires BLM to include in project-level NEPA analyses an evaluation of the project proposals and their effects on GRSG habitat based on the habitat and values affected.

114.   SSS-MD-35 limits the BLM from authorizing certain infrastructure activities—including the installation of fences and rangeland structures, and activities that alter or remove the natural vegetation—within a certain distance, or buffer, from leks. This directive is particularly strict within PHMAs.

115.   SSS-MD-32 reinforces this directive by requiring that the BLM incorporate

the Required Designed Features ("RDF") in ARMPA Appendix C in the development of any project or proposal. The RDFs require, among other things, the BLM to avoid building new wire fences within about 1.25 miles (2 km) of occupied leks.

116.  SSS-OBJ-2 requires BLM to incorporate the Habitat Objectives into the design of projects or activities, including the directive that certain trees are "absent or uncommon" in shrub and grassland areas within 1.86 miles of occupied leks and that protective sagebrush cover exists within 328 feet of an occupied lek.

117.  The EA, like the GWAR, does not contain a delineation of the leks, despite the ARMPA's various buffer and siting requirements for range infrastructure projects.

118.  Without any delineation of the leks, neither BLM nor the public can analyze whether the new fences and water infrastructure comply with the ARMPA's lek buffer and siting requirements; whether conifer treatments are being prioritized within 1.86 miles of occupied leks; and whether sagebrush cover exists within 328 feet of an occupied lek.

119.  LG-MD-11 directs BLM to design new structural range improvements—including fences, exclosures, spring developments, and storage tanks—"to minimize and/or mitigate impacts on GRSG habitat" by placing the improvements along existing disturbance corridors or in unsuitable habitat. BLM must explain its

justification for determining the approved buffer distances in each project decision.

120.   Yet, the EA and Grazing Decision fail to disclose, let alone justify, which of the authorized structural range improvements will be placed along existing disturbance corridors or unsuitable sage grouse habitat. The Grazing Decision merely states that all such improvements will be placed in those areas to the extent practical.

121.   Likewise, the Grazing Decision states that it will also place the authorized structural range improvements in unsuitable pygmy rabbit habitat to the extent practical.

122.   However, BLM does not disclose, let alone justify, which of the structural range improvements actually will be placed in unsuitable and suitable pygmy rabbit habitat.

123.   BLM also fails to explain why it was not practical to site the range improvements, if any, in unsuitable pygmy rabbit habitat.

124.   BLM also does not disclose any data showing historic or current suitable and unsuitable pygmy rabbit habitat.

125.   The ARMPA emphasizes the negative impact of habitat fragmentation on sage grouse. Vegetation Objective 2 ("VEG-OBJ-2"), for instance, directs BLM to "[i]ncrease the amount and functionality of seasonal habitats by," in part, "[i]ncreasing the amount, condition and connectivity of seasonal habitats" and

"[p]rotecting or improving GRSG migration/movement corridors."

126.   LG-MD-13 also requires BLM to prioritize the removal, modification, or marking of fences or other structures in areas of high collision risk to reduce GRSG mortality rates from fence strikes.

127.   Yet, the EA fails to disclose types of fences the Decision authorized to be added, why those fence types were selected, and how those fence types would impact sage grouse survival, the species' movement, and fragmentation of their habitat.

128.   The EA additionally neither discloses nor analyzes whether and where flight diverters should be installed on new and existing fencing to prevent sage grouse strikes and mortality, or whether certain fences should be removed for their strike risk.

129.   Instead, the BLM only generally states that fences and exclosures determined to be in a "high use area for sage grouse (i.e. fences within 1/4 mile of a lek) would be marked with flight diverters," meaning the agency will determine where flight diverters are appropriate at some later, unspecified time. This is particularly problematic since neither the EA nor the GWAR provide any delineations of the leks for the public to determine whether flight diverters are being installed on fences within a 1/4 mile of the leks.

130.   The EA also does not engage in a meaningful discussion of how the additional fencing will impede the movement of and pose a risk of injury or death from

entanglement to big game species, including antelope, pronghorn, deer, and elk.

131.  LG-MD-17 requires the BLM to monitor actual forage use and utilization rates by livestock in grazing allotments to ensure permitees are complying with the grazing permits' terms and conditions.

132.  However, both the EA and GWAR fail to disclose the actual utilization rates in the uplands of all the allotments.

133.  The EA also does not explain its adoption of a maximum 50% forage utilization level for the grazing permits or analyze that threshold's expected effect on and compatibility with sage grouse and their habitat.

134.  Likewise, neither the EA nor the GWAR discloses the actual stubble heights recorded in the riparian areas of the allotments.

135.  The EA does not explain its adoption of a four-to-six-inch stubble height minimum for grazing of vegetation along riparian areas or analyze that threshold's expected effect on and compatibility with sage grouse and their habitat.

136.  The EA fails to analyze the effects of re-authorizing widespread spring grazing on 28 allocations on sage grouse, their habitat, and nesting activity. Livestock grazing reduces the forbs and perennial grasses critical during nesting season, and the period of authorized grazing on those allocations overlaps with sage grouse nesting season. Two allocations have a grazing period set immediately before nesting season.

137.   The EA also does not analyze the effects of constructing new water developments on sage grouse and its habitat, including increased livestock distribution across the Watershed and attraction of sage grouse predators.

138.   Lastly, the EA fails to analyze the cumulative impacts of the BLM's Programmatic Vegetation Management ("DFO PVM") project on sage grouse and their habitat, other wildlife in the Grasshopper Watershed, and the greater Watershed ecosystem.

139.   The DFO PVM project authorizes the burning and thinning of thousands of acres of BLM-administered land across the DFO, including in the Grasshopper Watershed. It also authorizes "intensive targeted grazing for upland restoration." The DFO announced scoping for the DFO PVM just three days after the DFO issued the Final EA, six months before the DFO issued the FONSI and Proposed Grazing Decision, and nine months before the DFO issued the Decision Notice and Grazing Decision.

140.   As the Grasshopper Watershed is 90% sagebrush, the burning is very likely to have an impact on sage grouse and their habitat, as well as the other sagebrush obligates in the Watershed. Further, the addition of more grazing is very likely to impact sage grouse and their habitat, as well as other wildlife in the Watershed. Analysis of the cumulative impacts of the DFO PVM is necessary to account for its effects on wildlife in the Grasshopper Watershed.

*Riparian Treatments*

141.   The Decision authorizes riparian treatments along a total of 1.8 miles of Taylor Creek.

142.   Yet, the BLM fails to provide a reasoned explanation for the treatments.

143.   The EA represents that the treatments would reduce or remove conifers expanding into the riparian areas.

144.   However, the EA represents that Taylor Creek is considered Performing in Functional Condition.

145.   Additionally, though the GWAR states that conifer encroachment is a concern in Taylor Creek, the vegetation composition data it cites does not show that any streamside conifers exist.

146.   It also is unclear whether these treatments are intended to improve GRSG habitat and fulfill the Habitat Objective's goal of conifers being absent to uncommon within 1.86 miles of leks, since any location of leks is not disclosed.

147.   The BLM must provide adequate justification and analysis for this proposed project, particularly in light of the ARMPA's directive that the BLM "prioritize" activities that "conserve, enhance and restore GRSG habitats," per SSS-MD-5.

*Climate Change*

148.   Again, the ARMPA considers climate change a major threat to GRSG and their habitat.

149.   Livestock grazing on public lands massively contributes to the climate crisis. Recent studies have shown that greenhouse gas emissions from cattle on public lands equaled 12.4 million tons of $CO_2$ per year. This equates to, at the low end, $264–630 million per year, and at the high end, $1.1–2.4 billion per year.

150.   Yet, the EA eliminated climate change from its analysis of the Project's impacts on the environment.

151.   In eliminating climate change from its analysis of the Project effects, BLM touts the Project's benefits to greenhouse gas sequestration while disregarding its harms.

152.   On the one hand, BLM states it considered but eliminated climate change from its analysis because the scale of the action is small relative to global climate change. On the other hand, BLM explains that the Project's supposed land health improvements will "increase carbon sequestration."

153.   BLM cannot dismiss the project's contributions to global climate change while also lauding its supposed carbon sequestration benefits.

154.   In other words, BLM cannot omit any negative climate impacts of the Project when it includes the potential positive climate impacts.

155.   BLM also did not discuss the cumulative impacts of climate change on the Grasshopper Watershed, sage grouse, GRSG habitat, and other wildlife.

156.   It is undisputed that climate change has and will continue to affect Montana,

including increased air and stream temperatures, intensified drought, intensified wildfires, and the degradation of habitat resiliency.

157.   In fact, MT FWP identified exceptional drought in 2018, 2021, and 2022 as one of the causal factors of the notable decreases in sage grouse populations in the years following those droughts.

158.   The ARMPA also identifies climate change as a threat to sage grouse and their habitat.

159.   Yet the EA lacks any discussion of the cumulative impacts of climate change on the Watershed, sage grouse, GRSG habitat, and other wildlife.

*Alternatives Analysis*

160.   LG-MD-6 requires BLM to implement changes in grazing management when livestock management practices are "determined to not be compatible with meeting or making progress towards achievable habitat objectives." Potential modifications include, but are not limited to, changes in season or timing of use, numbers of livestock, distribution of livestock use, and duration and/or level of use.

161.   BLM found that livestock grazing was a significant causal factor in three allotments not meeting the Standards for Rangeland Health.

162.   Given the infirmities with the GWAR, including those described above, more allotments potentially do not meet the Standards for Rangeland Health.

163.   However, the BLM eliminated a reduced grazing and no grazing alternative

from its analysis.

164.  BLM stated that a reduced grazing and no grazing alternative would not "satisfy the purpose and need of the EA, the 2006 Dillon RMP as amended, or the FLMPA."

165.  This ignores the directive of LG-MD-6 to consider changing grazing management when livestock practices are not compatible with meeting habitat objectives.

166.  For instance, in the Buffalo Creek Allotment, which failed the riparian health and water quality Standards for Rangeland Health, BLM reauthorized all the same grazing terms and conditions, including animal unit months and season of use. BLM's only change was to "[d]elineate the BLM/private boundary with spray painted steel posts," then consider a permanent fence if resource conditions do not improve by 2030. Given the directives of ARMPA and NEPA, BLM should have considered reducing or eliminating grazing in the Buffalo Creek Allotment.

167.  Additionally, BLM's justification for eliminating a reduced or no grazing alternative focused on why a no grazing alternative was not feasible and omitted any discussion of why eliminating a reduced grazing alternative was justified.

168.  A reduced grazing alternative would satisfy not only the purpose and need of EA, the Dillon RMP, and FLMPA, but also the ARMPA.

**CAUSES OF ACTION**

## COUNT I

*BLM's failure to take a "hard look" at the Project's impacts on sage grouse and to disclose sufficient information to the public is a violation of NEPA and the APA.*

169.   All previous paragraphs are incorporated by reference.

170.   NEPA requires that agencies take a "hard look" at the environmental consequences of its proposed actions before the agency chooses a particular course of action, without favoring a pre-determined outcome. *Lands Council v. Powell*, 395 F.3d 1019, 1026–27 (9th Cir. 2005).

171.   A hard look under NEPA requires consideration of all foreseeable direct and indirect effects, and the cumulative impacts of the agency action. *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2001).

172.   A hard look "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006); 87 Fed. Reg. 23,453, 23,467 (Apr. 20, 2022) ("Agencies must disclose both the adverse and beneficial effects of a proposed project.")

173.   NEPA also requires the agency to establish the "baseline conditions which exist before a project begins" because "there is simply no way to determine what effect the project will have on the environment and, consequently, no way to comply with NEPA." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (cleaned up).

174.   "An agency need not conduct measurements of actual baseline conditions in every situation . . . [b]ut whatever method the agency uses, its assessment of baseline conditions must be based on accurate information and defensible reasoning." *Id*. (citation and quotation marks omitted).

175.   NEPA also requires the agency to disclose relevant information and analysis to the public early in the process, before decisions are made, and before actions are taken so that the public can play a role in both the decisionmaking and implementation of agency decisions. 40 C.F.R. § 1500.1(b).

176.   Here, BLM fails to adequately disclose and analyze important components of the baseline conditions in the Grasshopper Watershed in the EA and the GWAR in violation of NEPA and the APA.

177.   BLM does not disclose sage grouse population data and trends for the Grasshopper Watershed.

178.   BLM also does not analyze any sage grouse population trend data in the Grasshopper Watershed to, for example, understand the overall health of the species.

179.   BLM does not disclose the locations or any maps of the sage grouse leks in the Grasshopper Watershed, as well as the location of existing rangeland infrastructure relative to those leks.

180.   BLM does not provide any delineations or data showing the existing fenceline mileage and location, fence types, fence conditions, installed diverters, and recorded

strikes by sage grouse.

181.   BLM does not provide the conditions or flow of existing springs and their infrastructure.

182.   BLM also does not analyze the impact of existing water developments, many of which BLM acknowledges have not been adequately maintained, on sage grouse and sage grouse habitat.

183.   BLM does not disclose the actual forage utilization rates in the uplands of the allotments.

184.   BLM does not disclose the actual stubble heights recorded in the riparian areas of the allotments.

185.   These are critical components of the Project's baseline, and their omission is a violation of NEPA and the APA.

186.   BLM also fails to adequately disclose and analyze certain anticipated impacts of the Project on sage grouse and sage grouse habitat in the Grasshopper Watershed.

187.   BLM does not analyze the impacts of its re-authorization of widespread spring grazing on sage grouse and its habitat, particularly on the availability of forbs and perennial grasses for sage grouse, and on nest success.

188.   BLM does not explain or analyze the impacts of its adoption of a maximum 50% livestock forage utilization level in the Watershed's uplands for the reauthorized grazing permits.

189.   BLM does not explain or analyze the impacts of its adoption of a maximum four-to-six-inch stubble height minimum for grazing of riparian vegetation for the reauthorized grazing permits.

190.   BLM also does not disclose the types of fences authorized to be added.

191.   BLM does not analyze how the additional fencing authorized by the Project will impact sage grouse, including the increased risk for fatal strikes, the species' movement across the Grasshopper Watershed landscape, and the fragmentation of its habitat.

192.   BLM does not disclose or analyze whether and where flight diverters will be installed on the additional fences.

193.   BLM does not analyze the effects of constructing new water developments on sage grouse and its habitat, including increased livestock distribution across the Watershed and attraction of predators.

194.   These are significant components of the Project that are hazardous to sage grouse and therefore must be analyzed. BLM's failure to do so is a violation of NEPA and the APA.

## COUNT II

*The BLM's improper tiering to the GWAR is a violation of NEPA and the APA.*

195.   An agency can "tier" to, or incorporate by reference, a previously conducted environmental analysis, so long as that document is an EIS or an EA. *Earth Island*

*Instit. v. Muldoon*, 82 F.4th 624, 637 n.11 (9th Cir. 2023); 40 C.F.R. § 1501.11.

196.   An agency also can incorporate documents by reference, but they cannot be considered to determine whether the analysis is sufficient; the agency must provide their reasons for adopting the decisions or analyses in those materials. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1120 (9th Cir. 2018); 40 C.F.R. 1501.12.

197.   The GWAR is neither an EA nor an EIS, so it is not a NEPA document to which the Project EA can tier.

198.   Further, the Project EA failed to provide any independent analysis of the baseline conditions, including those absent from the GWAR, as identified in Count I.

199.   As such, the EA improperly tiers to the GWAR in violation of NEPA and the APA.

## COUNT III

*The BLM's failure to show that the Project complies with the ARMPA is a violation of FLPMA and the APA.*

200.   All previous paragraphs are incorporated by reference.

201.   Under FLPMA, all site-specific project decisions must conform with the ARMPA. 43 C.F.R. § 1610.5–3(a).

202.   Conformance means that the site-specific project decision shall be "specifically provided for in" the ARMPA, "or, if not specifically mentioned, shall

be clearly consistent with the terms, conditions, and decisions of" the ARMPA. *Id.*
§ 1601.0–5(b).

203.   BLM fails to demonstrate the Project's compliance with important standards in the ARMPA designed to protect sage grouse and sage grouse habitats, in violation of FLPMA and the APA.

204.   SSS-MD-7 requires BLM's project-level NEPA analyses to evaluate project proposals and their effects on GRSG habitat based on the habitat and values affected.

205.   BLM did not evaluate the effects of reauthorization widespread spring grazing on GRSG habitat.

206.   BLM did not evaluate the effects of adding new fencing on GRSG habitat, including habitat fragmentation.

207.   BLM did not evaluate the effects of adding new spring developments on GRSG habitat.

208.   SSS-MD-12 requires the BLM to monitor sage grouse and sage grouse habitat health to determine whether the soft and hard triggers have been met. This requires BLM to analyze population and habitat data, including but not limited to the number of active leks, population trends based on annual lek counts, and acres of available habitat.

209.   BLM did not disclose any monitoring data in the Grasshopper Watershed for the hard and soft triggers, including the population trend data.

210. BLM also did not evaluate or disclose whether any of the hard and soft triggers have been met.

211. Consequently, BLM did not evaluate whether it needed to adjust its management actions due to a hard or soft trigger being met, in violation of the directives of the ARMPA, FLPMA, and the APA.

212. The ARMPA requires BLM to monitor for and incorporate into its actions the Habitat Objectives in Table 2-2.

213. However, BLM did not disclose any delineations of the occupied leks in the Grasshopper Watershed for the public to evaluate whether the lek security requirements were being met, worked towards, or prioritized, including conifers and junipers being "absent or uncommon" in shrub and grassland areas within 1.86 miles of occupied leks.

214. BLM also unjustifiably relied on data taken after nesting/early brood-rearing season in concluding that the Watershed met the vegetation cover, height, and availability requirements of the Habitat Objectives.

215. LG-MD-12 requires BLM to evaluate existing livestock management range improvements and their effect on GRSG habitat.

216. BLM did not evaluate nor disclose the conditions of the existing spring developments and their effect on GRSG habitat, despite acknowledging that many of them have not been adequately maintained.

217.   BLM did not evaluate nor disclose the conditions of existing fences and their impact on sage grouse, despite acknowledging some of them needed to be repaired or removed.

218.   LG-MD-13 directs BLM to prioritize the removal, modification, or marking of fences or other structures in areas of high collision risk to reduce GRSG mortality from fence strikes.

219.   BLM did not identify the specific existing or new fences that it intends to remove, modify, or mark, or explain how it was prioritizing those efforts, despite acknowledging that many existing fences needed modification or marking.

220.   In sum, the Project is not clearly consistent with the terms, conditions, and decisions of the ARMPA, and therefore is a violation of FLPMA, and arbitrary and capricious under the APA.

## COUNT IV

*BLM's failure to take a "hard look" at the Project's cumulative impacts on wildlife and to disclose sufficient information to the public is a violation of NEPA and the APA.*

221.   BLM also fails to disclose and analyze a key reasonably foreseeable cumulative impact: the DFO PVA.

222.   A cumulative impact is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" by federal and non-federal actors. 40 C.F.R.

§ 1508.7.

223.   Reasonably foreseeable future actions include federal and non-federal activities not yet undertaken, but sufficiently likely to occur, such that a person of ordinary prudence would take it into account in reaching a decision. 42 U.S.C. § 4332(C); 40 C.F.R. § 46.30 (2020).

224.   The agency must "give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and difference between the projects, are thought to have impacted the environment." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971–72 (9th Cir. 2006).

225.   "The cumulative impact analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (citation omitted).

226.   BLM fails to identify, let alone detail and analyze the impacts of, the DFO PVA, which authorizes widespread burning and landscape treatments, including "intensive targeted grazing, in sage grouse habitat and across the DFO, including in the Grasshopper Watershed.

227.   The DFO PVA was reasonably foreseeable, as BLM announced the DFO PVA's scoping just three days after the DFO issued the Draft EA here and months before the DFO issued the Grasshopper Watershed Final EA, Proposed Grazing

Decision, FONSI, Decision Notice, and Final Grazing Decision.

228.  The DFO PVA also is authorized by the same field office and personnel as the Grasshopper Watershed Project.

229.  BLM's failure to list, detail, and analyze the impacts of the DFO PVA is a violation of NEPA and the APA.

230.  Alternatively, BLM's failure to supplement the EA when the DFO PVA's Draft EA, Final EA, FONSI, and Decision Notice were issued in March, July, and September 2025 is a violation of NEPA and the APA.

## COUNT V

*BLM's failure to take a "hard look" at the Project's impacts on designated sensitive species and big game is a violation of NEPA and the APA.*

231.  All previous paragraphs are incorporated by reference.

232.  Fences can threaten big game species in Grasshopper Watershed—pronghorn, antelope, deer, elk, etc.

233.  For instance, fences can entangle deer and elk and prevent pronghorn movement across the landscape.

234.  Yet, BLM fails to evaluate the effects of the additional fencing on big game species.

235.  BLM stated that it will site authorized grazing infrastructure in unsuitable pygmy rabbit habitat, to the extent practical.

236.   Yet, BLM fails to disclose which, if any, authorized structural range improvements will be located in unsuitable pygmy rabbit habitat.

237.   BLM also fails to explain why it was not practical for the structural range improvements, if any, to be located in unsuitable habitat.

238.   BLM additionally fails to disclose historic and current suitable and unsuitable pygmy rabbit habitat.

239.   These failures, individually and collectively, are violations of NEPA and the APA.

## COUNT VI

*BLM's failure to take a "hard look" at the climate impacts of the Project is a violation of NEPA and the APA.*

240.   All previous paragraphs are incorporated by reference.

241.   A hard look "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *N. Alaska Envtl. Ctr.*, 457 F.3d at 975; 87 Fed. Reg. at 23,467 ("Agencies must disclose both the adverse and beneficial effects of a proposed project.")

242.   "An agency's failure to consider an important aspect of the problem is one of the hallmarks of arbitrary and capricious reasoning." *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430 (9th Cir. 2018).

243.   "Climate change is having, and is expected to continue to have, alarming effects on our environment." *350 Montana v. Haaland*, 50 F.4th 1254, 1266 (9th Cir.

2022).

244. "The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. Natl. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).

245. Yet, BLM failed to satisfy its obligations with respect to climate change in three ways.

246. First, BLM does not analyze how climate change has affected baseline conditions in the Watershed and the identified resource issues, including sage grouse and sage grouse habitat.

247. This is a particularly notable error given MT FWP identified exceptional drought in 2018, 2021, and 2022 as the likely cause of the significant declines in sage grouse populations.

248. Second, in eliminating climate change as a resource that the Project may affect, BLM focuses on the Project's benefits to greenhouse gas sequestration while disregarding the Project's negative impacts on greenhouse gas emissions and the effects of climate change.

249. BLM's failure to acknowledge and discuss the negative impacts of the Project on the effects of climate change while touting the Project's benefits to the same is a violation of NEPA and the APA.

250.    Third, BLM excluded from its cumulative effects analysis any discussion of climate change, even though the effects of greenhouse gas emissions are recognized as the kind of cumulative effect which requires analysis under NEPA.

251.    These omissions are collectively and individually violations of NEPA and the APA.

## COUNT VII

*BLM's failure to consider a reduced grazing alternative is a violation of NEPA, FLPMA, and the APA.*

252.    All previous paragraphs are incorporated by reference.

253.    Under NEPA, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. 40 C.F.R. § 1502.14(a) (2019).

254.    The agency "must consider alternatives varied enough to allow for a real, informed choice." *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 876 (9th Cir. 2022).

255.    "The existence of a viable but unexamined alternative renders the environmental review conducted under NEPA inadequate." *City of Los Angeles v. FAA*, 63 F.4th 835, 844 (9th Cir. 2023) (quotations and citation omitted).

256.    In considering which alternatives to analyze, agencies must provide a "detailed statement" regarding why they were eliminated or not considered." 40 C.F.R. §§ 1502.14(a); 1508.9(b).

257.    BLM's elimination of a reduced and/or no grazing alternative is arbitrary and

capricious for two reasons.

258.   First, the three alternatives BLM considered continue grazing at almost the same level as one another, and therefore, there is no meaningful difference between the alternatives the agency considered with respect to the amount of authorized grazing.

259.   Second, BLM fails to provide an adequate explanation of why it eliminated a reduced grazing alternative.

260.   Though BLM states that it eliminated a reduced and/or no grazing alternative, its justification for doing so exclusively focuses on the incompatibility of a no grazing alternative with the purpose and need of the Project, the Dillon RMP, and FLPMA. It does not explain why eliminating a reduced grazing alternative is justified.

261.   In sum, BLM fails to satisfy the hard look standard in violation of NEPA and the APA because it did not consider a reasonable range of alternatives and because it did not justify its elimination of the reduced grazing alternative.

262.   With respect to FLMPA, LG-MD-6 of the ARMPA requires BLM to implement changes in grazing management when livestock management practices are "determined to not be compatible with meeting or making progress towards achievable habitat objectives." Potential modifications include, but are not limited to, changes in season or timing of use, numbers of livestock, distribution of livestock

use, and duration and/or level of use.

263.   Despite LG-MD-6, BLM eliminated a reduced alternative as a means of evaluating how it could remedy the issues on the allotments that failed the Standards for Rangeland Health.

264.   The alternatives either maintain the status quo or opt for very minor changes in grazing management, including adding new grazing infrastructure that also has negative effects on sage grouse, sage grouse habitat, and other wildlife.

265.   This is a violation of FLPMA and the APA.

## COUNT VIII

*BLM's Finding of No Significant Impact and decision not to produce an EIS is a violation of NEPA and the APA.*

266.   All previous paragraphs are incorporated by reference.

267.   An EIS is required under NEPA to examine all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

268.   An EIS must be prepared if substantial questions are raised whether a project may cause significant degradation of some human environmental factor. To trigger this requirement, a plaintiff need not show that significant effects will in fact occur. Rather, raising substantial questions whether a project may have significant effects is sufficient. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 f.3d 846, 864–65 (9th Cir. 2005).

269.   Agencies cannot "offset an action's adverse effects with other beneficial

effects" to avoid a significance determination. 40 C.F.R. § 1501.3(d).

270. In determining whether a federal action requires an EIS because it significantly affects the quality of the human environment, an agency must examine the effects of an action in terms of their "context" and "intensity." *Id*.

271. Context "delimits the scope of the agency's action, including the interests affected." *Blue Mtns. Biodiversity Project v. Jeffries*, 99 F.4th 438, 448 (9th Cir. 2024).

272. An action's context can include its "proximity to unique or sensitive resources"; "potential global, national, regional, and local contexts"; and both short- and long-term effects. 40 C.F.R. § 1501.3(d)(1).

273. "Intensity refers to the severity of impact within the selected context." *Blue Mtns. Biodiversity Project*, 99 F.4th at 448.

274. Factors that inform an agency's intensity determination may include: the degree to which the action may adversely affect unique characteristics of an ecologically critical area; and the degree to which the potential effects on the human environment are highly uncertain. 40 C.F.R. § 1501.3(d)(2)(ii), (iv).

275. "[O]ne of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocs.*, 402 F.3d at 864–65.

276. The Grasshopper Watershed is almost exclusively made up of what BLM designated as the highest value GRSG habitat, or PHMA.

277. Yet, the FONSI did not mention that the Project area included any ecologically critical areas, let alone a PHMA. The lack of any analysis of this component of the intensity factors is a violation of NEPA.

278. Further, the degree to which the potential effects on the human environment is highly uncertain because of the deficiencies in the analysis of the baseline conditions in the Watershed and of the effects of the Project analysis in the GWAR and EA.

279. The uncertainty is exacerbated by BLM's failure to disclose key information about the baseline and the Project.

280. It is also notable that, though the BLM discussed, to some degree, the context and intensity of the Project, the GWAR effectively established that BLM would produce an EA, not an EIS, for the Project.

281. Accordingly, there are substantial questions regarding whether the Project may have significant effects. Therefore, BLM's failure to prepare an EIS for the Project violations NEPA and the APA.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request this Court:

1. Declare the Project violates the law;

2. Vacate the Decision Record and Grazing Decision and/or enjoin implementation of the Project and Grazing Decision;

3.      Require BLM to produce an EIS for the Project;

4.      Require BLM to supplement the GWAR and the EA, if an EIS is not ordered,

to address the above-described deficiencies;

5.      Award costs, expenses, and reasonable attorney's fees as authorized by the

Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other statute; and

6.      Grant Plaintiffs any such further relief as may be just, proper, and equitable.


        Respectfully submitted this 17th day of November, 2025.

                        /s/Elizabeth M. Forster
                        FORSTER LAW, PLLC

                        /s/Timothy M. Bechtold
                        BECHTOLD LAW FIRM, PLLC

                        Attorneys for Plaintiffs