# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

|  |  |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES; NATIVE ECOSYSTEMS COUNCIL; and COUNCIL ON WILDLIFE AND FISH, <br><br> Plaintiffs, <br><br> vs. <br><br> AMANDA JAMES, Dillon Field Manager of the Bureau of Land Management; SONYA GERMANN, Montana/Dakotas State Director of the Bureau of Land Management; BILL GROFFY, Acting Director of the Bureau of Land Management; and UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Defendants. | Cause No. CV-25-104-BU-BMM <br><br> **ORDER ON MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council, and Council on Wildlife and Fish (collectively "Plaintiffs") have filed a motion for a temporary restraining order and preliminary injunction. (Doc. 13.) Plaintiffs ask the Court to enjoin Defendants Amanda James, Sonya Germann, Bill Groffy, and United States Bureau of Land Management ("BLM") (collectively "Defendants") from permitting spring grazing and authorizing grazing infrastructure projects in the

1

Grasshopper Watershed in southwest Montana. (Doc. 14 at 7.) Defendants oppose the motion. (Doc. 19.) The Court held a hearing on February 23, 2026. (Doc. 24.)

## BACKGROUND

Sage grouse occupy habitat across Montana. Sage grouse require sagebrush ecosystems for food, shelter, breeding, nesting, and brooding. 75 Fed. Reg. 13,987 (Mar. 23, 2010). The U.S. Fish & Wildlife Service listed sage grouse as "warranted, but precluded" under the Endangered Species Act in 2010. *Id*. at 13, 910. Sage grouse populations in Montana have decreased to a concerning degree recently, and over the past two decades. The Montana sage grouse population decreased about 30% between 2021 and 2024 and by nearly 50% from 2002 to 2024. Habitat loss contributes greatly to declines in sage grouse populations.

The region around Dillon, Montana, in the southwest corner of the state, provides important habitat for sage grouse populations. BLM adopted a conservation strategy for sage grouse located in southwest Montana, named the Idaho and Southwestern Montana Greater Sage Grouse Approved Resource Management Plan Amendment ("ARMPA"). (Doc. 14 Ex. 3.) ARMPA asserted that management of sage grouse habitat was "necessary to avoid the continued decline of populations across the species' range." (*Id*. at 20.) ARMPA amended the 2006 Dillon Resource

Management Plan ("RMP") and governs Defendants' actions in sage grouse habitat in the BLM's Dillon Field Office. (*Id*. at 19, 28.)

Plaintiffs allege that the Grasshopper Watershed ("Watershed"), located west of Dillon, Montana, contains highly valuable habitat for sage grouse. (Doc. 1 ¶ 2.) Plaintiffs claim that BLM authorized grazing, livestock management, and range improvement projects in the Grasshopper Watershed without adequately analyzing the impacts the grazing and projects would have on sage grouse, its habitat, and other wildlife habitat. (*Id*. ¶¶ 1-3.) Spring grazing in the Watershed generally occurs between April 1 and July 15. (*Id*. at 11 Ex. 5 ¶¶ 5-12.)

Plaintiffs have brought this action against Defendants under the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") based on Defendants' alleged failure to consider the grazing impacts on sage grouse in the Grasshopper Watershed (Doc. 14 at 7.) Plaintiffs claim that Defendants failed to consider the cumulative effects on sage grouse of a concurrent burning and deforestation project authorized by BLM and failed to analyze a reduced and/or no grazing allowance. (*Id*.) Plaintiffs also have brought a claim against Defendants under the Federal Land Policy & Management Act ("FLPMA") and

3

APA for Defendants alleged failure to comply with BLM's sage grouse management plan. (*Id*.)

## LEGAL STANDARD

District courts enjoy discretion regarding whether to grant or deny a temporary restraining order. *Miss Universe, Inc. v. Flesher,* 605 F. 2d 1130, 1132-33 (9th Cir. 1979); *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). Federal Rules of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders. The standard for issuing a TRO proves "essentially identical" to the standard for granting a preliminary injunction. *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1154 (D. Or. 2020); *see also Stuhlberg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir.).

A plaintiff seeking a temporary restraining order must establish the following four elements: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. The balance of equities and public interest "factors merge when the Government" is the party opposing the preliminary injunction request. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

Plaintiffs allege that Defendants "failed to take a hard look at the impacts of grazing in the Grasshopper Watershed on sage grouse, to consider the cumulative

effects of a concurrent burning and deforestation project authorized by the BLM on sage grouse, and to analyze a reduced and/or no-grazing alternative." (Doc. 14 at 7.) Plaintiffs further claim that Defendants "failed to comply with the [BLM's] sage grouse management plan." (*Id.*) Defendants argue that BLM's Watershed grazing management is not likely "the root cause of sage-grouse decline." (Doc. 19 at 16.) Defendants further assert that Plaintiffs could have filed this action promptly after the challenged decisions were made in 2024. (*Id.* at 8.) Defendants contend that the choice to delay filing weighs against Plaintiffs' arguments that an emergency now exists. (*Id.*) Defendants also contend that Plaintiffs are unlikely to succeed on the merits of their claims. (*Id.*) The Court will address the *Winter's* factors in turn.

## I.    Whether Plaintiffs have satisfied the requirements for a preliminary injunction under Fed. R. Civ. P. 65 and *Winter*

A plaintiff seeking a temporary restraining order or preliminary injunction must establish the following: (1) a likelihood to succeed on the merits, (2) a likelihood of suffering irreparable harm absent preliminary relief, (3) a balance of equities favoring the movant, and (4) that an injunction supports public interest. *Winter*, 555 U.S. at 20.

### A. Likelihood of Success on the Merits

The National Environmental Policy Act ("NEPA") requires federal agencies to "take a hard look" at the "environmental consequences" of their decision-making.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal citations omitted). The statute "does not mandate particular results." *Id.* NEPA instead "prescribes the necessary process" that agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Id.*

NEPA and FLPMA do not include a citizen suit provision so challenges to these statutes must be brought pursuant to the APA. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481, 496 (9th Cir. 2011). The APA allows persons to challenge final agency actions. *Id.* The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A rational connection must exist between the facts found and the conclusions made in support of the agency's action. *Kraayenbrink*, 632 F.3d at 481. The Court reviews the Department's compliance with NEPA and FLPMA under the arbitrary and capricious standard pursuant to the APA. *See Center for Biological Diversity v. Nat'l. Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).

### 1.    Defendants' Alleged Failure to Include Data in EA

Plaintiffs assert they are likely to succeed on the merits of their claim that Defendants failed "to take a 'hard look' at the impacts on sage grouse in violation of NEPA and the APA because Defendants fail[ed] to disclose crucial baseline information about the sage grouse population in the Grasshopper Watershed [and]

fail[ed] to analyze the cumulative impacts of spring grazing on sage grouse." (Doc. 14 at 14-15.) Plaintiffs argue that neither the GWAR nor the EA for the Watershed disclose any sage grouse population or monitoring data specific to the Watershed. (*Id.* at 17.) Plaintiffs cite as an example the fact that "20 known active leks and 7 unconfirmed, never confirmed, or confirmed inactive leks in the Watershed [exist], [yet] the documents provide no delineations [] of those leks or analysis of lek use, trends, or relationships to grazing activity. (*Id.* citing Ex. 1 at 160, Ex. 4 at 62.) Plaintiffs contend that Defendants cannot meaningfully assess the impacts of reauthorizing widespread grazing and grazing infrastructure projects on sage grouse without baseline information about sage grouse population status, lek distribution, or habitat condition in the Watershed. (*Id.* at 18.) The Court agrees.

Defendants argue that they took a hard look at the impact of the challenged decisions on sage grouse, and recognized that sage grouse populations have declined in the Western United States due to significant habitat losses. (Doc. 19 at 22-23, citing Doc. 14 Ex. 1 at 160.) Defendants assert that they explained why, "throughout the watershed, [greater sage grouse] GRSG habitat requirements are being met in PHMA." (*Id.* at 23, citing Doc. 14 Ex. 1 at 160.) Defendants contend that they provided data that reflected that habitat loss was not a concern, and instead that drought may be causing the declines in the sage grouse population. (*Id.*)

Defendants further claim that Plaintiffs point to no evidence that a significant decline in the sage grouse population has occurred within the Watershed, despite their assertions that spring grazing has taken place on most of the allotments for at least the past ten years. (*Id*.) Defendants state that the EA suggests that the sage grouse population in the Watershed may not have declined, because though male lek attendance dropped at one site, it increased at another site, and several new leks have been confirmed. (*Id*. citing Doc. 14 Ex. 1 at 160.) Defendants assert that their analysis indicates that livestock grazing generally has not caused land health to deteriorate in the Watershed, and where it has, they have taken proactive steps to address it. (*Id*. Ex. 1 at ¶ 18-19.)

Defendants also argue that Plaintiffs identify no requirement that BLM disclose sage grouse site-specific population numbers or lek information in every EA it compiles. (*Id*. at 24.) Defendants agree that ARMPA requires them to monitor the sage grouse population and lek information in certain habitats in southwestern Montana. (*Id*.)  Defendants also argue the ARMPA contains no disclosure requirements. (*Id*. citing Doc. 14 Ex. 3 at 34, 37-38, 212-13.)

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011) (citing *Robertson v. Methow Valley*

*Citizens Council,* 490 U.S. 332, 349 (1989) and *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1185 (9th Cir.2008)). "NEPA requires that the agency provide the data on which it bases its environmental analysis." *N. Plains Res. Council*, 668 F.3d at 1083. Defendants must provide data to support the conclusions in their environmental assessment. Whether ARMPA required Defendants to share specific population numbers or lek information presents a different question. Defendants' assertions that Plaintiffs simply must trust that Defendants have complied with NEPA, and ARMPA, and that engaging in the required monitoring activities conflicts with NEPA's guarantee that relevant information be available to the public.

*Northern Plains* presented similar facts. 668 F.3d at 1083. The BLM in *Northern Plains* informed the Surface Transportation Board ("Board") that insufficient data existed regarding the effects of the proposed project on sage grouse. *Id.* at 1084. The Board proposed to conduct sage grouse surveys during the project's operation, as well as proposing "pre-construction surveys" to determine the extent of sage grouse habitat in the project area. *Id.* The Ninth Circuit "concluded that the Board's actions were arbitrary and capricious because (1) without data on sage grouse populations the agency could not carefully consider whether the project would have a significant environmental impact and (2) the lack of data available to the public during the EIS process deprived citizens of the opportunity to participate

9

in the decision-making process." *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1000 (9th Cir. 2013) (citing *N. Plains Res. Council*, 668 F.3d at 1085). Defendants seemingly should know the answer to whether sage grouse populations in the Watershed remain stable, have declined, or have increased. This data should be included in a NEPA-compliant EA. Defendants also must share this data with the public to ensure citizens the opportunity to participate in NEPA's notice-and-comment process. The Court concludes that Plaintiffs likely could succeed on the merits as Defendants' actions appear arbitrary and capricious based on their failure to publish data supporting their conclusions in the EA.

### 2. Defendants' Alleged Failure to Analyze Cumulative Impacts

The Court next addresses Defendants' alleged failure to consider cumulative impacts on the sage grouse population.

### a. Raven Predation and Multiple Years of Spring Grazing

"[A]n EA may be deficient if it fails to include a cumulative impact analysis[.]" *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002). Defendants must have included a cumulative impact analysis in their EA for the EA to be sufficient under Ninth Circuit authority. *Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 399 F. Supp. 3d 888, 919 (D. Alaska 2019), *aff'd*, 825 F. App'x 425 (9th Cir. 2020). The Council of Environmental Quality's ("CEQ") governing regulations for Defendants' actions in 2024 defined cumulative impact as

"the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." 40 C.F.R. § 1508.7 (2024). "Cumulative impacts can result from *individually minor but collectively significant actions taking* place over a period of time." *Kern*, 284 F.3d at 1075 (quoting 40 C.F.R. § 1508.7 (2024)) (emphasis in original). The Government rescinded these regulations on February 25, 2025, but they apply here as Defendants issued the relevant Decision before the rescission of the regulations. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025); see *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 n.3 (9th Cir. 2022) (explaining that the version effective at the time the Decision was issued governs our analysis).

"'Consideration of cumulative impacts requires some quantified or detailed information' that results in a 'useful analysis,' even when the agency is preparing an EA and not an EIS." *Native Ecosystem Council v. Judice*, No. CV 18-55-BLG-SPW, 2019 WL 1131231, at *7 (D. Mont. Mar. 12, 2019) (quoting *Kern*, 284 F.3d at 1075). "When there is no EIS containing a cumulative effects analysis, 'the scope of the required analysis in the EA is correspondingly increased.'" *Native Ecosystem Council*, 2019 WL 1131231, at *7 (quoting *Kern*, 284 F.3d at 1077). "Without such information, neither the court nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Native Ecosystem Council*,

2019 WL 1131231, at *7 (quoting *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d 592, 603 (9th Cir. 2010)).

Plaintiffs argue that Defendants failed to analyze the cumulative impacts of "repeatedly exposing sage grouse to spring grazing's harms." (Doc. 14 at 19.) Plaintiffs assert that "neither the GWAR nor the EA provide even general statements about the cumulative impacts" on sage grouse of spring grazing in the Watershed for at least the past ten years. (*Id.*) Plaintiffs acknowledge that Defendants cited literature that found limited effects from spring grazing on sage grouse. (*Id.* at 20.) Plaintiffs argue that no disclosed data or site-specific observations support Defendants' conclusions that spring grazing's impacts are "potential," "minimal," and unlikely to contribute to a loss of species viability. (*Id.*) Plaintiffs further contend that Defendants failed to take into account the "consensus" literature stating that grazing has highly regional impacts, or address Plaintiffs' comments about the impact of spring grazing on raven predation. (*Id.* at 20-21.)

Defendants argue that Plaintiffs failed to "identify *cumulative* impacts that BLM failed to consider, offer record evidence to support the impacts' existence, or identify the 'other' projects about which they have concerns." (Doc. 19 at 27, citing *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 18 F.4th 592, 603-04 (9th Cir. 2021)). Defendants also contend that they analyzed the impact of past grazing on sage grouse habitat. (Doc. 19 at 27.) Defendants cited the EA's assertions

regarding periodic monitoring, which included the following statement: "Within sage grouse PHMA, sage grouse habitat would be periodically monitored and measured to ensure habitat objectives are being met in accordance with the 2015 ARMPA." (*Id*. quoting Doc. 14 Ex. 1 at 32, 87.) Defendants argue that "[t]his past and present monitoring and analysis necessarily accounts for the impact of past activity in the same area." (Doc. 19 at 28.)

Defendants further contend that the EA considered raven predation as an indirect effect of grazing, primarily due to water troughs. (*Id*.) Defendants also assert that they considered the study submitted by Plaintiffs which concluded that "livestock grazing can have 'detrimental, neutral, or positive effects' on sage grouse habitat." (*Id*. quoting Doc. 14 Ex. 11 at 28 [study submitted in public comment by Plaintiffs'].) Defendants assert that the study's conclusions comport with their own determination within the EA that grazing is not expected to contribute to loss of sage grouse viability. (Doc. 19 at 28, citing Doc. 14 Ex. 1 at 99.) Defendants do not argue that they actually discussed raven predation within the EA. Defendants also imply that raven predation does not present a large concern because the decision only authorizes one water trough in the PHMA, and two in total. (Doc. 19 at 28, citing Doc. 14 Ex. 1 at 42, 43.)

The Court recognizes that an agency "is only required to focus on the issues that are truly significant to the action in question[,]" and "impacts [should] be

discussed in proportion to their significance." *Klamath Forest All. v. United States Forest Serv.*, 746 F. Supp. 3d 761, 772 (N.D. Cal. 2024), *aff'd sub nom. Am. Whitewater v. United States Forest Serv.*, No. 24-6402, 2025 WL 2945591 (9th Cir. Oct. 17, 2025) (quoting *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010)). "When reviewing an agency decision to determine whether the hard look standard is met, courts must 'employ a 'rule of reason,'' rather than 'fly-speck' the agency's analysis or 'act[ ] as a type of omnipotent scientist.'" *Klamath Forest All*, 746 F. Supp. 3d at 772 (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022)).

A court "should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025)). "That includes deferring to the agency regarding what level of detail is required, what alternatives are feasible, and the scope of the environmental effects that the NEPA document will address." *Seven Cnty.*, 605 U.S. at 183. The guidance provided by *Seven Cnty*. instructs the Court not to overly second-guess Defendants' choices regarding the scope of the cumulative analysis in the EA. The guidance does not strip the Court of all abilities to exercise review over Defendants' decisions.

The instruction from *Seven Cnty*. and Ninth Circuit precedent applying *Seven Cnty*. straightforwardly applies to Plaintiffs' challenges concerning raven predation. It appears Defendants were aware, and acknowledged the potential impacts, of raven predation on sage grouse, yet determined that the impact was not sufficiently significant to warrant further analysis. "An agency is not required to compose the Aeneid whenever it assesses a particular issue or decides that a particular issue does not warrant a full analysis." *Cascadia Wildlands*, 153 F.4th at 904. Defendants' choice to limit the level of discussion in the EA is supported by the fact that the Decision authorized only one water trough in the PHMA and the study cited by Plaintiffs themselves recognized the mixed impact of raven predation. The Court will defer to Defendants on this aspect of their cumulative analysis.

*Seven Cnty*. and its progeny apply less straightforwardly to Defendants' alleged failure to include a cumulative impacts analysis for past and current grazing. For example, in *Cascadia Wildlands*, the Ninth Circuit did not fault the agency for failing to include a high level of detail in the EA, largely because the agency recently had issued an RMP for the area that included "a great deal of detail about impacts to [the species]." 153 F.4th at 905. The EA incorporated the RMP, which included a full EIS, and viewed in totality, the documents included site-specific analysis and "exhaustively discussed" the impacts. *Cascadia Wildlands*, 153 F.4th at 904-05. None of the relevant documents here include such detail. *Ctr. for Biological*

*Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 999 (9th Cir. 2025), also analyzed NEPA claims using *Seven Cnty.*'s guidance and concluded that the agency's actions had been arbitrary and capricious. The specific analysis in *Ctr. for Biological Diversity* proves more relevant to the discussion over alternatives, yet the conclusion that even a highly-deferential review can hold the agency violated NEPA proves significant.

The Court does not require that Defendants provide a detailed analysis of cumulative impacts at a lek-specific basis. *See Env't Prot. Info. Ctr. v. USFS*, 451 F.3d 1005, 1010 (9th Cir. 2006). "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." *Id.* Instead, "NEPA documents should generally analyze impacts to imperiled species at a site-specific level rather than through an overly general lens." *Anderson v. Evans*, 314 F.3d 1006, 1019–20 (9th Cir. 2002). Defendants' assertions that they analyzed cumulative effects on spring grazing cannot prove sufficient without any data, detailed analysis, or support for the conclusion. Defendants are not expected to "conduct a[n] [allotment-by-allotment] analysis of the issue or identify each individual [lek] where [impacts would be [felt]." *Cascadia Wildlands*, 153 F.4th at 905. Defendants must conduct and share, however, at least some degree of analysis within the EA. The Court concludes that Plaintiffs have established that they likely would succeed on the merits as Defendants' actions appear arbitrary and

16

capricious based on the failure to conduct and publish a cumulative impacts analysis on spring grazing's effect on sage grouse.

### b. Compliance with ARMPA and FLPMA

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701, et seq., dictates the framework under which BLM manages public lands. It reamins the policy of the United States, pursuant to FLPMA, that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further states that the policy of the United States requires that the "United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(8).

BLM accomplishes this directive by developing, maintaining, and revising RMPs. 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2). All site-specific decisions must conform with the relevant RMP. 43 C.F.R. § 1610.5–3(a). The ARMPA amended the Dillon RMP, and all Defendants' proposed actions must comply with the ARMPA. (Doc. 14 at 22.)

Plaintiffs argue that Defendants violated ARMPA and FLPMA by failing to provide any baseline information about the sage grouse population or leks in the Watershed because the ARMPA requires Defendants to obtain and use that information to assess the health of sage grouse populations. (Doc. 14 at 22.) Defendants assert that they complied with ARMPA by monitoring and that nothing in ARMPA requires them to disclose population or lek information. (Doc. 19 at 29.) The Court presumes that Defendants are undertaking their obligations "conscientiously and thoroughly." *Angov v. Lynch*, 788 F.3d 893, 905 (9th Cir. 2015). The APA requires disclosure of relevant data and information. The ARMPA and FLPMA, apparently, do not. The Court declines to find that Plaintiffs have established that a likelihood of success on the merits based on their claim that Defendants violated FLPMA and ARMPA.

### c.  BLM Project in Dillon Field

Plaintiffs assert that Defendants further violated NEPA by failing to discuss the impacts of a "reasonably foreseeable, landscape-altering BLM project in the Dillon Field Office." (Doc. 14 at 23.) Plaintiffs argue that Defendants should have considered Defendants' Dillon Field Office Programmatic Vegetation Management Project ("Project"). (*Id*. Ex. 12.) Plaintiffs argue that the "project authorizes up to 10,000 acres per year of intentional fires and deforestation in sagebrush ecosystems and 1,000 acres per year of so-called "rangeland improvements[,]" which would

18

include "additional grazing, herbicide application, and other high-impact ground-disturbing activities." (*Id*. Ex. 12 at 17-20.) Plaintiffs contend that "Defendants intend to implement these activities in sage grouse habitats across the entire 905,000 acres of the Dillon Field Office over an unspecified number of years." (*Id*. Ex. 12.)

Plaintiffs assert that the Project was reasonably foreseeable because the scoping announcement for the Project occurred just one week after Defendants released the Watershed EA on March 11, 2024. (*Id*.) Plaintiffs note that "[t]he scoping notice stated that the project was the culmination of two decades of field assessments identifying resource issues in the Dillon Field Office[,]" and "[t]he announcement did not just outline 'general plans' for future actions; it described the types of proposed actions, their anticipated scale, their intended purpose, and the method of site selection." (*Id*. at 23-24.) The Court agrees that the Project was reasonably foreseeable.

Defendants argue, instead, that sufficient information on the Project was not available to permit meaningful consideration. (Doc. 19 at 30, quoting *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006)). Defendants assert that the Project did not concern individual treatment at a specific geographic location, but rather "considered the impacts of a new vegetation management approach 'on a landscape level' throughout the region." (Doc. 19 at 30, citing Doc. 14 Ex. 12 at 6-7.) Defendants further contend that the Project made clear that "site-

specific implementation of the treatments it considered would require BLM to undertake further NEPA analysis." (*Id*.) The Court agrees with Defendants.

"Although '[i]t is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now,' *Kern v. BLM,* 284 F.3d 1062, 1075 (9th Cir.2002), nor do 'we require the government to do the impractical,' if not enough information is available to permit meaningful consideration." *Env't Prot. Info. Ctr.*, 451 F.3d at 1014. The EA included a "general discussion of effects" to the extent practical like in *Env't Prot. Info. Ctr*. Defendants must conduct a separate EA once they have more specific information about the parameters of the Project and more meaningfully can assess the impacts.

### d. Consideration of a Reduced and/or No-Grazing Alternative

Plaintiffs assert that "Defendants' failure to consider a reduced or no-grazing alternative violates NEPA and the APA because it precludes Defendants from making an informed decision on the [p]roject's environmental impacts." (Doc. 14 at 25.) Plaintiffs also argue that Defendants' statement of "Purpose and Need" was unreasonable because it defined its range of objectives in "unreasonably narrow terms" and "predetermined the outcome" by assuming that "grazing will continue[.]" (*Id*. at 30.) Plaintiffs further assert that even if the Purpose and Need statement was reasonable, a reduced or no-grazing alternative would have been consistent and feasible, and it was arbitrary and capricious to not consider an alternative that

20

presented a different level of grazing. (*Id*. at 27-29, citing *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050, 1051 (9th Cir. 2013)). Defendants argue that they provided a "sufficient explanation for [their] decision not to analyze an alternative that [they did] not view as reasonable." (Doc. 19 at 33, quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 991 (9th Cir. 2022)).

An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir. 2010) (citation omitted). The stated purpose and need of a proposed agency action dictates the range of alternatives that an agency must consider under NEPA. Courts should "begin[ ] by determining whether or not the [EA's] Purpose and Need Statement was reasonable." *Audubon*, 40 F.4th at 981 (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004)). If the Purpose and Need statement proves reasonable, courts employ a "rule of reason" analysis to determine whether the agency considered an adequate range of alternatives to the proposed action. *Westlands*, 376 F.3d at 868 (citing *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)).

An agency "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Westlands*, 376 F.3d at 868 (quotation omitted). NEPA does not require a discussion of "[a]lternatives that are unlikely to be implemented" or that are "inconsistent with the [agency's] basic policy objectives." *Res. Ltd., Inc.*

*v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993) (quotation omitted). This inquiry is "'essentially the same' as an abuse of discretion analysis." *Audubon*, 40 F.4th at 980 (quoting *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020)). "Thus, an 'agency will have acted arbitrarily and capriciously only when the record plainly demonstrates that [the agency] made a clear error in judgment in concluding that a project meets the requirements of NEPA.'" *Audubon*, 40 F.4th at 980 (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012)). A court's "only role" is "to confirm" that the agency has addressed feasible alternatives to the proposed project. *Ctr. for Biological Diversity*, 141 F.4th at 995 (quoting *Seven Cnty.*, 605 U.S. at 180).

Defendants presented discussion of their decision not to include a no-grazing or reduced grazing alternative in the EA. (Doc. 14 Ex. 1 at 28-29.) The discussion references the data on which allotments were failing to meet the standards for rangeland health. (*Id*. at 28.)  The analysis further recognizes that livestock grazing represented a "significant causal factor" in the allotments' poor conditions. (*Id*.) The discussion then addresses direct loss of forage, operational costs, and fencing problems. (*Id*.)

Plaintiffs fail to persuade sufficiently the Court that Defendants' Purpose and Need statement is unreasonable because they provide little analysis or argument to support such a conclusion. Plaintiffs' other arguments that Defendants' do not

sufficiently explain why a no-grazing or reduced grazing alternative is not consistent and feasible with the plans proves somewhat more compelling. At least one post-*Seven Cnty.* case in the Ninth Circuit concluded that an agency arbitrarily and capriciously eliminated alternatives. *Ctr. for Biological Diversity*, 141 F.4th at 995. Plaintiffs do not analogize, however, to *Ctr. for Biological Diversity* and the facts here prove different.

*Ctr. for Biological Diversity* concluded that the BLM arbitrarily and capriciously had eliminated smaller scale alternatives based on the reasoning that they were not economically viable. 141 F.4th at 997. BLM proceeded to approve a smaller-scale version of the project following the EA which conflicted with its earlier justification for having eliminated the alternatives. *Id*. The Ninth Circuit extensively discussed BLM's actions and concluded that this inconsistency undermined BLM's earlier justification and showed that the agency later changed course without providing new reasoned analysis. *Id*. at 999. The Ninth Circuit did not conclude, however, that the original decision to exclude the scaled-back alternative was arbitrary and capricious.

The Court concludes that because the "bedrock principle of judicial review in NEPA cases can be stated in a word: Deference[,]" it would be inappropriate to excessively second-guess Defendants' scope of alternatives here. *Ctr. for Biological Diversity*, 141 F.4th at 998 (quoting *Seven Cnty.*, 605 U.S. at 185). The Court

23

determines that Plaintiffs have failed to demonstrate a likelihood of success on the claim that Defendants insufficient reasoning for excluding the reduced or no-grazing alternatives from the EA.

**B. Likelihood of Suffering Irreparable Harm Absent Preliminary Relief**

Plaintiffs argue that they are likely to suffer irreparable harm if an injunction is not granted because "the authorized spring grazing and grazing infrastructure threaten the viability of the greater sage grouse." (Doc. 14 at 30-31.) Plaintiffs assert that "[a]lmost the entire Watershed is designated priority habitat for sage grouse and essential for breeding, nesting, and early brood-rearing[,]" and "[s]pring grazing occurs precisely when sage grouse are most vulnerable, yet the Project authorizes continued grazing without evaluating its effects on nest success, egg and chick predation, or long-term population viability." (*Id*. at 31, citing Ex. 4 at 31.) Plaintiffs cite a "BLM-supported monitoring study showing that only 35% of sage grouse nests had suitable herbaceous cover and that sage grouse often had to travel far from their leks to find adequate nesting habitat. (*Id*. at 31, citing Ex. 2 at Ex. B.)

Plaintiffs assert that "[e]ach lost nest and brood represents a permanent reduction in reproductive output, making the harm to the population of sage grouse in southwest Montana irreversible." (*Id*. at 31.) Plaintiffs argue that these impacts will cause them "and their members to suffer irreparable harm to their aesthetic,

recreational, scientific, spiritual, and educational interests." (*Id*. at 32, citing *Fund for Animals v. Lujan*, 962 F.2d 1391, 1396 (9th Cir. 1992)).

Defendants assert that the data indicates that "BLM's Watershed grazing management is not the likely root cause of sage-grouse decline." (Doc. 19 at 16.) Defendants argue that sage grouse habitat availability has remained constant over the past few years in Southwest Montana and the number of leks has increased. (*Id*., citing Ex. 2 ¶¶ 13-15, 18.) Defendants argue that sage grouse populations generally oscillate and that "the [Montana Department of Fish, Wildlife, & Parks] MTFWP observed that [the] population 'would likely take a few years' to recover, but recent conditions have been 'favorable . . . for nesting and brood rearing.'" (*Id*. at 17, citing Doc. 14 Ex. 2 at 3.)

Defendants further argue that "[s]pring grazing will occur on only about a third of BLM-managed PHMA within the Watershed" and that even if Plaintiffs are correct that grazing harms sage grouse, the impact is limited in scope." (*Id*. at 17-18, citing Ex. ¶ 20.) MTFWP data indicates there are nearly 1,000 confirmed active sage grouse leks in Montana, and only 20 of those are in the Watershed. (*Id*. at 18, citing Doc. 14 Ex 2. at 5, Ex. 1 at 160.) Defendants further assert that the literature demonstrates mixed conclusions and Plaintiffs' opinions should not be privileged over the agency's reasoning. (*Id*. at 18-19.)

The Court declines to go so far as explicitly requiring that Plaintiffs demonstrate irreparable harm to the species as a whole in this case. It would prove sufficient for Plaintiffs to demonstrate "irreparable injury from the deaths of individual animals where plaintiffs have established an affinity for or an aesthetic interest in the particular, individual animals at issue." *Idaho Rivers United v. United States Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1263 (W.D. Wash. 2015) (citing *Humane Soc. of U.S. v. Bryson,* No. 3:12–cv–00642–SI, 2012 WL 1952329, at \*6 (D.Or. May 30, 2012), and *Fund for Animals v. Norton,* 281 F.Supp.2d 209, 220–21 (D.D.C.2003) (which collected cases holding that the killing of animals causes irreparable harm to those with a special interest in the individual animals)). The threshold cannot be too low though. *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009). The loss of a single individual in the species is not sufficient. *Id*.

The Court concludes that Plaintiffs have sufficiently alleged harm to their recreational, scientific, spiritual, and educational interests, yet they fail to demonstrate a likelihood of irreparable harm. Plaintiffs' contentions that sage grouse loss will occur are unsupported by specific data and rely primarily upon general assertions about the status of sage grouse populations across the state. *Oregon Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1270 (D. Or. 2022), concluded that the plaintiffs had failed to demonstrate irreparable harm when their primary data

26

related to the state's sage grouse population over the past two decades rather than evidence that the grazing would cause a significant decrease in the particular sage grouse population. The Court recognizes that it proves likely that Defendants' own failures to include sufficient data in the EA have contributed to Plaintiffs' lack of information. The burden remains on Plaintiffs, however, to demonstrate irreparable harm. The Court concludes that Plaintiffs have failed to demonstrate a likelihood of irreparable harm given the seemingly low percentage of the Montana population of sage grouse that occupy the Watershed and the speculative nature of the harm. The Court declines to address Defendants' complaints concerning Plaintiffs' alleged delay in filing.

### C. Balance of Equities and the Public Interest

The Court will consider together whether the balance of equities weigh in Plaintiffs' favor and whether the public interest favors injunctive relief in conjunction because the last two factors merge when the government is a party. *See Winter*, 555 U.S. at 20. "[D]istrict courts must give serious consideration to the balance of equities." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citation omitted). Courts must consider "all of the competing interests at stake." *Id.*

Plaintiffs argue that Defendants' actions in permitting spring grazing will cause irreparable harm to sage grouse and that Defendants' actions violated the law. (Doc. 14 at 33-34.) Defendants argue that twenty businesses rely on grazing on

27

public lands in the Watershed and blocking grazing could cause severe financial hardship for permittees and Defendants. (Doc. 19 at 37.) Plaintiffs have failed at this time to demonstrate that the balance of equities and public interest tip sharply in their favor. *Bushue*, 594 F. Supp. 3d at 1270. The Court's reasoning is primarily based on Plaintiffs' failure to demonstrate irreparable harm.

## CONCLUSION

Plaintiffs have failed to establish all the requirements under Fed. R. Civ. P. 65 and *Winter*. Plaintiffs sufficiently demonstrated a likelihood of success on the merits based on their claims that Defendants' actions were arbitrary and capricious in failing to disclose data and baseline information in the EA, and in seemingly failing to conduct and publish a cumulative impacts analysis on spring grazing's effect on sage grouse. Plaintiffs failed to demonstrate irreparable harm, however, or to prove that the balance of equities and public interest tip sharply in their favor. The Court declines to grant a preliminary injunction at this time. The Court fully will address all of these issues in the course of resolving the merits of Plaintiffs' claims.

## ORDER

Accordingly, **IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order (Doc. 13) is **DENIED**.

DATED this 11th day of March, 2026.

Brian Morris, Chief District Judge
United States District Court