**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES; NATIVE ECOSYSTEMS COUNCIL; and COUNCIL ON WILDLIFE AND FISH,<br><br>Plaintiffs,<br><br>vs.<br><br>AMANDA JAMES, Dillon Field Manager of the Bureau of Land Management; SONYA GERMANN, Montana/Dakotas State Director of the Bureau of Land Management; BILL GROFFY, Acting Director of the Bureau of Land Management; and UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>Defendants. | Cause No. CV-25-104-BU-BMM<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiffs Alliance for the Wild Rockies, Native Ecosystems Council, and Council on Wildlife and Fish (collectively "Plaintiffs") have filed a motion for summary judgment on Counts I, III, V, VI, and VIII. (Doc. 36.) Plaintiffs do not seek summary judgment on Counts II, IV, and VII and voluntarily dismissed those claims. Defendants Amanda James, Sonya Germann, Bill Groffy, and the United States Bureau of Land Management ("BLM") (collectively "Defendants") have

filed a cross motion for summary judgment. (Doc. 40.) The Court held a hearing on October 26, 2026. (Doc. 51.)

## BACKGROUND

The greater sage-grouse is a bird species that occupies habitat across Montana. Sage-grouse rely on sagebrush habitat exclusively for food, shelter, breeding, nesting, and brooding. 75 Fed. Reg. 13,987 (Mar. 23, 2010). The U.S. Fish & Wildlife Service have found that the listing of the sage-grouse is "warranted, but precluded," indicating that it meets listing criteria for endangered status. *Id*. at 13,910. Sage-grouse populations have been declining over the past two decades across the West. (Doc. 37 at 10.) The pygmy rabbit is a similarly threatened species that also relies on sagebrush ecosystems. (*Id.* at 35.)

The region around Dillon, in the southwest corner of Montana, provides important habitat for sage-grouse. In response to the finding that the listing of sage-grouse was "warranted, but precluded," BLM adopted a regional conservation strategy for sage-grouse named the Idaho and Southwestern Montana Greater Sage-grouse Approved Resource Management Plan. ("ARMPA"). (*Id.* at 12.) ARMPA amended the 2006 Dillon Resource Management Plan and governs Defendants' actions in sage-grouse habitat in the BLM's Dillon Field Office. (*Id.*)

This directive includes Defendants' actions in the Grasshopper Watershed ("the watershed"), the area at issue in this case.

BLM produced the Grasshopper Watershed Assessment Report ("GWAR") in 2022, which documents the resource conditions of BLM managed lands in the watershed. (Doc. 38 ¶ 47.) The GWAR states that "an EA would be completed to address resource issues or concerns identified within the 36 allotments in the GW" based on the GWAR's management recommendations. (*Id.* ¶ 48.) BLM issued an EA on March 11, 2024, that identified resource issues and proposed alternatives. (*Id.* ¶ 51.) BLM issued a Finding of No Significant Impact ("FONSI") for the Grasshopper Watershed EA and a Notice of the Proposed Grazing Decision for the Grasshopper Watershed on September 5, 2024. (*Id.* ¶ 58-9.) Two months later, BLM finalized the EA Decision Record and the Final Grazing Decision. (*Id.* ¶ 61.) The Final Grazing Decision renewed spring grazing permits for all 36 grazing allotments managed by BLM. (*Id.* ¶ 65-7.) BLM renewed twenty-four allotments under the "no action" alternative and these allotments will continue to be managed as they have been. (*Id.*) BLM renewed twelve allotments under Alternative B, with some changes to existing permit terms and conditions to improve rangeland health. (*Id.*)

Plaintiffs now seek summary judgment on five of their eight claims. Plaintiffs allege that Defendants failed to take a "hard look" at impacts on sage-

grouse, pygmy rabbits, and big game when Defendants failed to analyze or disclose critical data in the EA. Plaintiffs allege that Defendants failed to analyze cumulative impacts of spring grazing on sage-grouse. Plaintiffs allege that the project fails to comply with ARMPA in violation of FLMPA. Plaintiffs allege that BLM failed to take a "hard look" at climate impacts. And Plaintiffs allege that the BLM's FONSI and failure to produce an Environmental Impact Statement ("EIS") also violates the National Environmental Policy Act ("NEPA").

## LEGAL STANDARD

Summary judgment proves appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine material fact dispute requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. at 248.

## DISCUSSION

NEPA requires federal agencies to "take a hard look" at the "environmental consequences" of their decision-making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal citations omitted). The statute "does not mandate particular results." *Id.* NEPA instead "prescribes the necessary process" that

agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Id.*

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701, et seq., dictates the framework under which BLM manages public lands. It remains the policy of the United States, pursuant to FLPMA, that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further states that the policy of the United States requires that the "United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(8).

NEPA and FLPMA include no citizen suit provision. Parties seeking to challenge federal agency actions pursuant to these statutes must file through the Administrative Procedure Act ("APA"). *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481, 496 (9th Cir. 2011). The APA allows private parties to challenge final agency actions. *Id*. The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A rational connection must exist between the facts found and the conclusions made in support of the agency's action. *Kraayenbrink*, 632 F.3d at 481. The Court reviews Defendants' compliance with NEPA and FLPMA under the arbitrary and capricious standard

pursuant to the APA. *See Center for Biological Diversity v. Nat'l. Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).

## I. Sage-grouse

### a. *Data Sufficiency in the EA*

Plaintiffs allege that "Defendants fail to take a 'hard look' at the impacts on sage-grouse in violation of NEPA and the APA." (Doc. 37 at 14.) Plaintiffs argue that "Defendants fail to disclose crucial baseline information about the sage-grouse population in the Grasshopper Watershed." (*Id.*) Plaintiffs contend, similar to the preliminary injunction phase, "neither the GWAR nor the EA disclose any sage-grouse population monitoring data, trend analysis, or synthesis for the Grasshopper Watershed . . .." (*Id.* at 17.) Plaintiffs also assert that Defendants have additional sage-grouse population information in their possession that indicates declining sage-grouse populations in the watershed. (*Id.*) Plaintiffs argue that Defendants' failure to disclose or discuss this data in the EA deprives Plaintiffs and the public of a "full understanding of sage-grouse health in the Watershed and . . . an opportunity to meaningfully comment on the Defendant's decision." (*Id.* at 18.)

Defendants contend that they have included a "substantial amount of information in the EA about the sage-grouse population in the Watershed." (Doc. 40-1 at 13.) Defendants point out that the EA provided information about population trends at five leks, and that the trend data provided shows that

population has fluctuated, but that those changes "are not cause for particular concern." (*Id.*) Defendants also argue that the data does not support the notion that grazing on the watershed "correlates strongly with sage-grouse population decline." (*Id.* at 14.) Defendants point to the historic and current viability of sage-grouse populations in the watershed after decades of livestock grazing. (*Id.* at 14.)

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011) (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989) and *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1185 (9th Cir.2008)). "NEPA requires that the agency provide the data on which it bases its environmental analysis." *N. Plains Res. Council*, 668 F.3d at 1083. Defendants must provide data to support the conclusions in their environmental assessment.

The Administrative Record shows that BLM possessed additional, less favorable data regarding sage-grouse populations. BLM had lek data that it discussed, but did not provide, in the EA. AR0000295; AR0002294. BLM also had data from "wings from sage-grouse harvested across southwest Montana." AR0002294. This data allowed BLM to measure the ratio of adult to juvenile sage-grouse. The ratio documented in 2023 indicated that it was "the seventh time over

the last ten years that observed recruitment was below the long-term average and the fourth consecutive year that observed sage-grouse recruitment was below average . . ..” *Id.* The analysis goes on to conclude that “[t]hat string of relatively poor recruitment years has likely influenced the recent observed population decline.” *Id.*

The Court stated in its preliminary injunction order that “Defendants seemingly should know the answer to whether sage-grouse populations in the Watershed remain stable, have declined or have increased. This data should be included in a NEPA-compliant EA.” (Doc. 27 at 10.) This fact remains true after the development of the administrative record. Defendants seemingly *did* know, or at least knew better than disclosed, the status and trend of the sage-grouse populations in the watershed. NEPA requires Defendants to include all relevant data that supports the conclusions in their EA. This relevant information includes lek data and wing harvest data.

The Court acknowledges Defendants’ concerns regarding BLM’s agreement with the Montana Department of Fish, Wildlife, and Parks which precludes the sharing of lek information. The Court does not view requiring additional data as violative of this agreement. The terms of the agreement require BLM to refrain from sharing with third parties “unless required by a court . . . or by law[.]” AR0001780. The law requires the sharing of this data here. Defendants

additionally cite Montana state law prohibiting the sharing or misuse of "exact coordinate location data." Mont. Code Ann. § 87-6-222. The Court recognizes the important concerns reflected by the agreement and the Montana statute. This order should not be read to require BLM to disclose specific location data for any leks or other sage-grouse habitat.

*b. Cumulative Impacts*

Plaintiffs argue that "Defendants fail to analyze the cumulative impacts of spring grazing on sage-grouse." (Doc. 37 at 14.) Plaintiffs contend that despite authorizing grazing on the watershed for the past 10 years, Defendants failed to analyze or disclose the impact of this grazing on sage-grouse populations. (*Id.* at 19.) Plaintiffs point to data disclosed in the Administrative Record indicating that significant portions of the watershed fail to meet all habitat goals. Plaintiffs allege that the EA proves deficient without this analysis.

Defendants argue that they have included the necessary cumulative impacts analysis. (Doc. 40-1 at 19.) Defendants assert that BLM thoroughly monitors the watershed's health. (*Id.* at 21.) This study necessarily bakes in the impacts of spring grazing. (*Id.*) BLM further explicitly considered the impact of past grazing activity on rangeland health and habitat. (*Id.* at 22.) Defendants contend that Plaintiffs' argument that Defendants needed to consider forb height proves both

misleading as to the requirements of ARMPA and not a cumulative impacts argument. (*Id.* at 24-25.) Defendants assert that Plaintiffs have failed to identify a specific cumulative impact that the agency failed to consider as required by the Ninth Circuit. (*Id.* at 27) (citing *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 18 F.4th 592, 603-04 (9th Cir. 2021)).

An EA proves deficient if it fails to include a cumulative impact analysis. The Council of Environmental Quality's 2024 regulations defined cumulative impact as "the impact on the environment which results from the incremental impact of the action when aged to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7 (2024). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* "Consideration of cumulative impacts requires some quantified or detailed information that results in a useful analysis, even when the agency is preparing an EA and not an EIS." *Center for Environmental Law and Policy v. U.S. Bureau of Reclamation,* 655 F.3d 1000, 1007 (9th Cir. 2011) (internal quotation and citation omitted).

An agency has discretion on how to structure an EA, including the cumulative impacts analyses, as long as the agency presents the required substance. *Montana Wildnerss Ass'n v. Connell,* 725 F.3d 988, 1002 (9th Cir. 2013); *Cascadia Wildlands v. Bureau of Indian Affairs,* 801 F.3d 1105, 1112 (9th Cir. 2015). An

agency may "characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected the area." *Ctr for Env't L. & Pol'y v. U.S. Bureau of Reclamation,* 655 F.3d 1000, 1007 (9th Cir. 2011). A court "should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025)). The guidance provided by *Seven County* instructs the Court not to overly second-guess Defendants' choices regarding the scope of the cumulative analysis in the EA.

*Center for Environmental Law and Policy* also proves instructive. The Ninth Circuit characterized the discussion in the cumulative impacts section in the environmental analysis as "perfunctory." *Ctr for Env't L. & Pol'y,* 655 F.3d at 1008. The Ninth Circuit noted, however, that this perfunctory discussion was not "reflective of the [agency's] overall approach." *Id.* "The analysis of various effects in other portions of the EA display[ed] sensitivity to, and consideration of, the multitude of changes previously wrought by mankind[.]" *Id.* The same reasoning applies here. Defendants did perform some explicit cumulative impacts analysis. Each resource issue includes a one-to-two-page cumulative impacts section. These cumulative impact sections admittedly are not dense with data. A separate three-

page section also summarizes the relevant past, ongoing, and reasonably foreseeable future action. AR0000204-206.

Defendants also analyzed "various effects" throughout other portions of the EA. An agency can consider past actions as part of the "existing conditions of the areas." *Ctr fir Env't L. & Pol'y,* 655 F.3d at 1008 (internal quotation and citation omitted). BLM included extensive analysis of the watershed's overall conditions detailed in both the EA and the GWAR. This analysis of habitat conditions and health necessarily takes into account past spring grazing. BLM also explicitly considered the overall impact of early grazing activity and its management evolution. AR0000204. BLM considered the impact of grazing on rangeland health and habitat. AR0000220-227; AR0000233-240. BLM found that "all uplands in the watershed were meeting standards." AR0000385.

The EA includes no cumulative analysis of past spring grazing as applied to sage-grouse specifically. To require such an analysis, however, would involve the type of micromanaging that *Seven County* instructs the Court to avoid. *Seven Cnty.*, 605 U.S. at 183. BLM includes cumulative impacts analysis both explicitly and implicitly throughout the EA. BLM chose to structure the cumulative impacts analysis around specific resource issues rather than individual species or each kind of authorized activity. In accordance with *Seven County,* the Court will not overly second-guess this choice. Defendants' analysis was not arbitrary or capricious.

*c. Climate Impacts*

Plaintiffs argue that "Defendants fail to analyze the impacts of drought and climate change on sage-grouse and critical components of their habitat." (Doc. 37 at 14.) Defendants assert that BLM included adequate discussion of climate change in the EA. The EA stated that "[w]hile the effects of climate change are expected to affect vegetation throughout the landscape, the BLM is still mandated to manage public lands to meet or make significant progress towards meeting land health standards." AR0000158. Given this obligation, BLM declined to analyze the issue of future climate impacts in further detail. Defendants point out that the EA already accounts for existing climatic conditions. (Doc. 40-1 at 24.) Defendants also argue that given the uncertainty of climate impacts and the ten-year time frame of the project future projections would be speculative and outside the scope of this EA. (*Id.* at 25.)

The Court is sympathetic to Plaintiffs' concerns. Changing climatic conditions create a moving target for predicting the impacts of all land management decisions. NEPA regulations requiring that the agency consider "the reasonably foreseeable effects of climate change on the proposed action . . ." were promulgated to address this reality months after Defendants finalized the EA. 40 C.F.R. § 1508.1 (July 1, 2024). The Court agrees with Defendants, however, that Plaintiffs cite no Ninth Circuit precedent to support the claim that Defendants had

an obligation "to account for the impact of potential future climate conditions on a site-specific project" before the introduction of the new regulations. (*Id.*) Ninth Circuit precedent cited by Plaintiffs reiterates the well-established requirement that the agency review the climate impacts of the proposed project itself. *Montana Env't Info. Ctr. v. Haaland*, No. CV 19-130-BLG, 2024 WL 1406535, at *4 (D. Mont. Apr. 2, 2024); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1077 (D. Mont. 2023), *aff'd in part, rev'd in part*, No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025). The Court also agrees with Defendants that the EA's analysis proves sufficient to establish the watershed's pre-project conditions.

NEPA regulations effective at the time of the EA did not require Defendants explicitly to analyze the potential impacts of climate change on the proposed project. 40 C.F.R. § 1508.1(g) (2022). Defendants sufficiently analyzed the climate impacts *of* the proposed project. The EA details the potential impacts of all treatment types both qualitatively and quantitatively. AR0000158-160. Based on this assessment, the EA concluded that the impacts would be minimal. *Id.* The level of detail in the EA's evaluation of climate impacts falls into "a broad zone of reasonableness" given the character of the project. *Seven Cnty.,* 605 U.S. at 183. Defendants' analysis does not prove arbitrary or capricious.

*d. Violation of FLPMA*

FLPMA, 43 U.S.C. § 1701, et seq., dictates the framework under which BLM manages public lands. It remains the policy of the United States, pursuant to FLPMA, that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further states that the policy of the United States requires that the "United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(8).

BLM accomplishes this directive by developing, maintaining, and revising Resource Management Plans ("RPMs"). 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2). All site-specific decisions must conform with the relevant RMP. 43 C.F.R. § 1610.5–3(a). The ARMPA amended the Dillon RMP, and all Defendants' proposed actions must comply with the ARMPA. (Doc. 37 at 12.)

Plaintiffs point to Defendants' failure to include data indicating that "the average forb height across the Watershed and its designated PHMA is less than half of the minimum established in the ARMPA[.]" (*Id.* at 34.) Defendants did not

address that habitat objective when evaluating the effects of continued spring grazing. (*Id.*) Plaintiffs allege that this omission violations the ARMPA. (*Id.*) Defendants argue that Plaintiffs ignore ARMPA's broader framework. Defendants claim that the metrics in the ARMPA do not represent minimums but instead provide "habitat objectives" that ARMPA itself acknowledges are not universally obtainable. (Doc. 40-1 at 27.) "In short, a deviation from the objectives is not a per se violation of the ARMPA." (*Id.* at 27-28.)

The Court agrees with Defendants that a deviation from the objectives does not render a project in that area a per se violation of ARMPA. Simply *meeting* the habitat objectives is not all that ARMPA requires. ARMPA provides that "GRSG habitat within the project area will be *assessed* during project-level NEPA analysis within the management area designations . . .." AR0002548 (emphasis added). It also provides an objective that the agency should "[i]ncorporate GRSG Seasonal Habitat Objectives . . . into the design of projects or activities, as appropriate, based on site conditions and ecological potential, unless . . . at least one of the follow conditions can be demonstrated and documented in the NEPA analysis . . .." AR0002543.

Forb height represents one of the GRSG Seasonal Habitat Objectives. AR0002544. Defendants measured forb height in an analysis relied on by the GWAR. (Doc. 37 at 23.) Defendants left forb height out of the GWAR and EA. The

GWAR and the EA considered all other metrics measured in the same analysis. (*Id* at 24.) The ARMPA required Defendants to assess the habitat within the project area. The decision to exclude forb height from that habitat assessment in the GWAR and EA without explanation proves arbitrary and capricious. Defendants must include an analysis of forb height data. Alternatively, Defendants must explain why forb height data does not represent an appropriate metric when assessing the habitat at issue.

## II. Pygmy Rabbits

Plaintiffs allege that Defendants failed to take a "hard look" at the impacts of the installation of grazing infrastructure on pygmy rabbits. (Doc. 37 at 35.) The EA provides that "[a]ny proposed pipelines and water troughs will be located in existing disturbed areas or unsuitable . . . pygmy rabbit habitat to the extent practical." (*Id.* at 37.) Plaintiffs' central contention is that Defendants either have (1) failed to obtain the necessary data to identify suitable and unsuitable pygmy rabbit habitat, or (2) have that information, but have failed to disclose it to the public. (*Id.* at 38.) Defendants contend that the EA relies on research indicating that livestock do not pose a threat to pygmy rabbit burrows. (Doc. 40-1 at 36.) Defendants further assert that BLM has established protocols for identifying pygmy rabbit habitat that would be applied by BLM employees tasked with siting the water infrastructure. (*Id.* at 37.)

Defendants are required to take a "hard look" at the environmental consequences of the proposed project on pygmy rabbit. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Plaintiffs' arguments go to the depth and breadth of Defendants' analysis. As a result, the Court must consider whether that analysis "fall[s] within a broad zone of reasonableness." *Seven Cnty.,* 605 U.S. at 183. It does here.

Defendants determined that "[n]one of the alternatives in this EA are expected to impact pygmy rabbit." AR0000297. Defendants cite a recent study concluding that the presence of cattle did not "markedly influence" habitat structure and burrow integrity when maintained at sustainable levels. *Id.* Defendants also cite "the fact that pygmy rabbits have persisted . . . for the past 25 years under current management." *Id.* This analysis considers available science on pygmy rabbit presence and grazing impact. It considers additional evidence that the species remains active throughout the Watershed. This analysis constitutes a sufficiently "hard look" within a "broad zone of reasonableness." *Robertson*, 490 U.S. at 350; *Seven Cnty.,* 605 U.S. at 183.

The Court agrees with Defendants that the EA and Final Grazing Decisions' inclusion of a design feature to avoid disturbing pygmy rabbit habitat does not represent an admission of significant impacts. The Court declines to penalize

Defendants for taking a proactive approach to conservation. Defendants' analysis was not arbitrary or capricious.

### III. Big Game

Plaintiffs argue that Defendants authorize new livestock fences in the watershed without discussing or disclosing the impact of those fences on big game. (Doc. 37 at 41.) Defendants point to analysis that the winter range of mule deer and pronghorn is "not expected to be impacted by cattle grazing." (Doc 40-1 at 39.) The EA also points out that even though cattle grazing creates additional competition for elk, "elk numbers . . . have historically been near management objectives." AR0000236. Defendants argue that they acknowledge the risk of entanglement, and that the EA commits to mitigating that hazard by modifying fences consistent with the BLM Fence Manual Handbook. (Doc. 40-1 at 39-40.) Defendants further assert that Plaintiffs offer no reason to doubt their conclusion that the construction of less than four miles of fence within the "367,000 acres (of nearly 600 square miles)" of the watershed does not constitute a significant impact. (*Id.* at 40.)

Defendants are required to take a "hard look" at the environmental consequences of the proposed project on big game. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Plaintiffs' arguments go to the depth

and breadth of Defendants' analysis. Once again, this approach forces the Court to consider whether that analysis "fall[s] within a broad zone of reasonableness." *Seven Cnty.,* 605 U.S. at 183. It does here.

The Court agrees that the new areas of fencing prove de minimis on the scale of the watershed. Defendants addressed the minor entanglement and mortality risks and committed to mitigating any big game impacts via fencing modification. Given the scale of the proposed infrastructure, the acknowledgment of impacts and mitigating measures, and the deference due to the agency, the Court finds that its analysis of the impacts falls within a "broad zone of reasonableness." The Court declines to find Defendants' analysis of big game impacts to be arbitrary or capricious.

## IV. Failure to produce an EIS

NEPA requires an agency to prepare an EIS if the project will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). The requirement to prepare an EIS "can be triggered if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Friends of Animals v. Burgum*, 164 F.4th 738, 757–58 (9th Cir. 2026) (citing *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208 1212 (9th Cir. 1998). Regulation at the time of this action required BLM to

"examine both the context of the action and the intensity of the effect." 40 C.F.R. § 1501.3(d) (2024). Context required the agency to consider "the characteristics of the geographic area" including "unique or sensitive resources." 40 C.F.R. § 1501.3(d)(1) (2024). Intensity required the consideration of eight factors addressing the severity and certainty of the potential impacts. 40 C.F.R. § 1501.3(d)(2) (2024).

Plaintiffs assert that the impacts of the proposed actions on the environment remain highly uncertain "[b]ecause Defendants never gathered, disclosed, or analyzed the information necessary to support their conclusions[.]" (Doc. 37 at 47.) Defendants counter that BLM concluded that the action did not have highly uncertain effects because "[t]he effects of livestock grazing have been well documented for decades, and action alternatives have been developed to maintain and/or improve land health." AR000316.

Plaintiffs fail to demonstrate that "substantial questions" have been raised as to whether the project will have significant impacts. The long history of grazing in the area and the modest, routine nature of the proposed new infrastructure give the Court no reason to believe that significant impacts will result. As addressed above, the EA lacks some data required by NEPA. The disclosure of that data proves important for purposes of public transparency but is not anticipated to fundamentally alter the efficacy of this project. Defendants' FONSI meets the

requirements of NEPA regulations, and Defendants did not violate NEPA by not preparing an EIS.

## V. Remedy

Plaintiffs point out that "[v]acatur is the presumed remedy where an agency has acted unlawfully." *W. Watersheds Project v. Schultz*, CV 22-149-M-DWM, 2025 U.S. Dist. LEXIS 182524, at *25 (D. Mont. Sept. 17, 2025) (citing *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018)). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Comms. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n,* 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Courts consider "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).

Vacatur would not be appropriate here. The EA's failure to disclose all relevant data is not "such a fundamental flaw" that BLM would be unlikely to

adopt the same rule on remand. *Id.* Especially given the extensive study of overall rangeland health, the Court concludes that Defendants' decision represents a well-reasoned one that lacks some required details. The appropriate remedy is to remand without vacatur to allow BLM to provide these additional details. This remedy ensures that the public has full information regarding the baseline conditions of impacted species without disturbing BLM's measured approach to land management.

## ORDER

Accordingly, **IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 36) and Defendants' Cross Motion for Summary Judgment (Doc. 40) are **GRANTED in part** and **DENIED in part.**

- The Court remands to the agency without vacatur for the addition of necessary data and analysis to the Environmental Assessment as identified in this Order.
- The agency must include in the Environmental Assessment all available data necessary to support a complete assessment of the status and populations trends of sage-grouse in the watershed.

- The agency must include in the Environmental Assessment analysis of the forb height habitat objective for sagebrush ecosystems or provide an explanation for the omission of that metric.

**DATED** this 13th day of November, 2026.

Brian Morris, Chief District Judge
United States District Court